**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE S. MICHAEL, SUSAN MICHAEL, DOROTHY MICHAEL, and ROBERT C. MICHAEL, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. |
| CHRISTINE LETCHINGER, R. DREW IRVIN, GERALD NELLESSEN, PETER FRIEDMAN, KATHLEEN O'HARA, BRIAN HAMER, SUSAN GARRETT and the VILLAGE OF LAKE BLUFF, a municipality, | ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**COMPLAINT**

NOW COME the plaintiffs, GEORGE S. MICHAEL, SUSAN MICHAEL, DOROTHY

MICHAEL and ROBERT C. MICHAEL, by their attorneys, RICHARD S. ZACHARY P.C., and

complaining of the defendants, CHRISTINE LETCHINGER, R. DREW IRVIN, GERALD

NELLESSEN, PETER FRIEDMAN, KATHLEEN O'HARA, BRIAN HAMER, SUSAN

GARRETT, and the VILLAGE OF LAKE BLUFF, state as follows:

**Jurisdiction and Venue**

1.      The plaintiffs are bringing this action under 42 U.S.C. § 1983 ("Section 1983") to

obtain redress for the deprivation of their constitutional rights by and through the abuse of official

policies and practices by representatives of local or State government.  This Court has jurisdiction

over plaintiffs' cause of action under 28 U.S.C. § 1343.

2.      Venue is proper in this Federal District under 28 U.S.C. § 1391, since (i) the

plaintiffs reside in this District; (ii) the majority of the defendants reside and do business in this

District; (iii) the vast majority of the acts and omissions giving rise to this lawsuit occurred in the Northern District of Illinois.

**The Parties**

3.     The defendant CHRISTINE LETCHINGER ("Letchinger") is Village President of Lake Bluff, Illinois.

4.     The defendant R. DREW IRVIN ("Irvin") is the Building Commissioner and former Village Administrator for Lake Bluff, Illinois.

5.     The defendant PETER FRIEDMAN ("Friedman") is the Village Attorney for Lake Bluff, Illinois.

6.     The defendant GERALD NELLESSEN ("Nellessen") is the Building Code Supervisor for the Village of Lake Bluff, Illinois.

7.     The defendant KATHLEEN O'HARA ("O'Hara") is a member of the Board of Trustees for Lake Bluff, as well as a coordinator employed by Lake Forest High School in Lake Forest, Illinois.

8.     The defendant BRIAN HAMER ("Hamer") is the Director of the Illinois Department of Revenue, headquartered in Springfield, Illinois.

9.     The defendant, SUSAN GARRETT ("Garrett") is an Illinois State Senator, whose district includes substantial parts of Lake County inclusive of the Village of Lake Bluff, Illinois.

10.     The VILLAGE OF LAKE BLUFF (the "Village") is a municipality comprised of approximately 6,000 residents, of a predominantly [95%] Caucasian constituency, bordering on Lake Michigan and situated about 35 miles north of the City of Chicago, in Lake County, Illinois.

11.     Plaintiffs GEORGE S. MICHAEL and SUSAN MICHAEL are a married couple of Armenian descent, residing with their daughter DOROTHY MICHAEL at 1955 Shore Acres

Drive in Lake Bluff, Illinois.  They have two other daughters.

12.     The plaintiff ROBERT C. MICHAEL is a resident of Cook County, Illinois.

## SUMMARY OF THIS ACTION

13.     This lawsuit has been occasioned by the defendants' systematic abuse of the customs, policies and practices of local and State government, in regard to the granting or denial of tax exemptions, building permits, and zoning variances, and the assessing of fines or sanctions. Acting in concert or collusion with each other, under color of state or municipal law, the defendants have jointly and severally (i) brought about the reversal of a religious property tax exemption, by and through *ex parte* communications and behind-the-scenes alliances; (ii) issued work stoppages without any proper purpose, in willful disregard of their own prior authorizations; (iii) filed pretextual lawsuits in order to recoup the expenses incurred in other proceedings; (iv) levied groundless and unconscionable fines; (v) selectively enforced Village ordinances for ulterior purposes; (vi) accorded disparate and unequal treatment to individuals without due process of law.  Such actions have deprived the plaintiffs of their constitutional rights, and warrant an award of substantial damages under Section 1983.

## ALLEGATIONS COMMON TO ALL COUNTS

### I.     Factual Background:

14.     In or about October of 2004, George and Susan Michael relocated their family from the Cook County area to the Village of Lake Bluff in Lake County, Illinois.  As of such date, the couple had been married for over 20 years, during which time George had worked alongside his brother Robert as a banker and Realtor.  The couple's main interest, apart from raising their three daughters, was found in the observances of their Armenian-Christian faith.  George and Susan had long been parishioners of St. Gregory of the Illuminator Armenian Church in Chicago,

Illinois ("St. Gregory's"), which catered to the Armenian-Christian community. George's brother Robert was a member of the congregation, and was very close to the family.

15    Throughout their marriage, Susan had suffered from primary progressive degenerative multiple sclerosis ("MS"). One of the couple's three daughters, Dorothy, was also showing signs of early-stage MS, and was mentally handicapped. The needs of Susan and Dorothy for specialized accommodation had led to the family's decision to move to Lake Bluff. Susan's MS had caused her to incur a complication known as Autonomic Dysfunction, causing her blood pressure to drop suddenly if subjected to increased stress, with life-threatening consequences if she were caused to panic. In 2002, Susan's physician had suggested that George "bring her near the water" – i.e., that a new home along the lakeshore in a peaceful and beautiful setting might help stabilize Susan's medical condition. The hazing which Dorothy was undergoing at her high school in a Chicago suburb spurred the family's resolve to find a new community which could offer an appropriate environment for both mother and daughter.

16.    In October of 2003, the family purchased a residence located at 1955 Shore Acres Drive in Lake Bluff, Illinois, in the vicinity of the long-established Shore Acres Country Club (hereinafter also "Shore Acres"). The property faced upon Lake Michigan, and included a private beach accessible via a stone stairway which led down a declivity to the shore. Susan had fallen in love with the surroundings, explaining excitedly that it was literally a dream come true. Before buying the property, George and Susan researched the available programs in Lake Bluff for a person such as Dorothy, and confirmed that the community offered a curriculum and specialized facilities designed to meet her needs.

17.    Unbeknownst to the family, the Village of Lake Bluff was not a particularly auspicious environment for a family of Armenian-Americans, whose shared complexion was

conspicuously dissimilar from the Anglo-Saxon constituency which dominated the community. At all times relevant to this Complaint, it is believed that the Village, by and through its officials and representatives, had developed certain policies and practices to help ensure that the racial, ethnic, and religious identities or affiliations of its residents remained at its historic [and current] proportion. As of October of 2003, on information and belief, approximately 96% of its residents were White, of whom at least 90% were of Anglo-Saxon origin. As of October of 2003, on information and belief, there were no places of worship in the Village which were not Protestant denominational in affiliation.

18.     At all times relevant to this Complaint, the Village of Lake Bluff maintained the following customs, policies or practices in regard to construction projects in the Village:

(a)     A Submission Policy, requiring at least one set of blueprints, plans or drawings to be delivered to the Village's Building Department as a condition precedent for Village approval of the project;

(b)     A No-Receipt Policy, precluding and forbidding the issuance of a receipt for any of the blueprints, plans or drawings submitted to the Building Department pursuant to the Submission Policy;

(c)     A Transfer Policy, whereby any and all blueprints, plans and drawings submitted to the Building Department were sent to a storage facility in the municipality of Lake Forest, Illinois.

19     **The detached garage.**   Upon its acquisition by George and Susan Michael, the property at 1955 Shore Acres Drive in Lake Bluff came with a freestanding structure adjacent to the front yard, in which there was (i) a pre-existing garage; (ii) a pre-existing studio with a kitchenette; (iii) *a pre-existing shower*, sink, and toilet. On information and belief, the detached

structure (hereinafter the "detached garage" or "freestanding garage") had been in existence for at least seventy-five (75) years when the family purchased the property in 2003.

20.     After acquiring the property at 1955 Shore Acres in late 2003, George undertook substantial modifications to the home.  A construction crew removed one-third of the existing residence, to make room for a therapeutic pool and rehabilitation room for Susan and Dorothy, a racquetball court for their two younger (and quite healthy) daughters, and two additional bedrooms.  The total square footage of the home was substantially reduced, but the resultant living environment was more conducive to the needs of the disabled women.

21.     The Michaels' daughters commenced to attend school in Village of Lake Bluff in the autumn of 2004, at which time the family was still residing in suburban Cook County.  For the next several weeks, George drove his daughters to and from school, as the main phase of the modifications was completed.  In October of 2004, the family moved into their new residence.

22.     Prior to moving to Lake Bluff, the Michael family had rarely felt singled out for the physiognomy which they shared with other members of their ethnic group.  Upon taking up residence in the Village, there was a growing sense of surrounding hostility, which emanated from the representatives of local government and seemed rooted in their racial otherness.  Other than the members of their family, there didn't appear to be a single resident whose evident ethnicity could not be summed up by means of a well-known acronym, incidentally the name of a stinging insect.[1]  The social niche for people of color in the community was relegated to the servant class, providing scant precedent for a cadre of orthodox Armenians taking up residence in a beachfront home that dated back to the 1930's.  Moreover, their address made them subject to the extra-political authority which the Village accorded by policy and practice to the Shore Acres County Club, whose members evinced a disdain for the newcomers that was quite evident.

---

[1] No disrespect intended.

**II.**     **First Phase of Disparate Treatment:**

23.     In September of 2004, George overheard a Village police officer use an ugly racial slur toward his beautiful, intelligent daughters Anna and Georgeanne, just after dropping them off at school. The officer was standing in profile to George, and was unaware that the vehicle waiting to merge into traffic, its driver's side window a handful of feet away, had just released the two schoolgirls who passed beneath his caustic scrutiny. A few days later – while the officer's racial insult was still echoing in his ears – George was subjected to a similar racial epithet as he was driving down the private road toward his home. Upon glancing in the direction of the remark, George met the unforgiving stares of a group of Shore Acres members.

24.     Prone by nature to give others the benefit of the doubt, George would have been inclined to discount the evidence of his senses – to assume that he must have misheard a couple innocent phrases as racial insults, despite the clarity of the epithets which he overheard. But an incident soon occurred which left little doubt that the family was being subjected to disparate treatment by the leaders of the community.

25.     In or about November of 2004, George was somewhat surprised to learn that his family was expected to contribute $7,500.00 to Shore Acres Country Club as their pro rata share of the cost of resurfacing the road [Shore Acres Drive] which ran along the boundary of the club. The bearer of such tidings, a Shore Acres member, explained that since Shore Acres Drive was a private road, the residences were expected to pitch in when it came to maintenance. The member seemed surprised that no one at the Village had bothered to mention this to him before closing on the home. George handed over $7,500.00 to the country club as requested, finding a touch of irony in contributing to an organization that would never accept him as a member. A few weeks later, a company hired by Shore Acres began to handle the repaving work.

26.     By late February of 2005, the resurfacing of the road was behind schedule, reportedly due to Shore Acres having underestimated the cost of the project. In or about March of 2005, George was summoned to an "introductory meeting" at the country club, whereupon its members gave George an ultimatum: either he shouldered the remaining cost of repaving the entire road – while adding an additional layer to its surface – or George's trucks would be denied access to Shore Acres Drive for any remaining work. The country club stated that George's extra contribution would cost him an additional $7,500.00, which was a small price to pay for the disruptive effect that George's trucks were causing for golf outings at the country club.

27.     Confused by the disproportionate burden placed upon him for a project benefiting many, George contacted the Village. A Lake Bluff representative explained that the country club was allowed to exercise authority over the residents who lived along Shore Acres Drive. The fact that the family did not belong to the country club – indeed, were almost certainly the only residents along that road who weren't members – could not change the Village's policy of non-interference. George asked what his legal recourse was, if he refused to pay the additional $7,500.00 now being demanded of him. *The official responded that the Village would have no choice but to compel him to cooperate*. Seeing no alternative, George proceeded to pay another $7,500.00 – on top of the $7,500.00 already assessed – to the Shore Acres Country Club.

28.     Upon the pavers finishing up the repaving of the road, it was revealed that they had omitted to resurface one section only, located directly in front of the Michaels' home. The ugly cluster of potholes left at such location was hardly unintentional. George was forced to pay an additional $7,300.00 to resurface the section of Shore Acres Drive in front of his driveway, bringing his total outlay to $22,300.00. On information and belief, no other resident of the Village contributed a substantial fraction of such expenditure.

29.     Disproportionate treatment during this period was not confined to the resurfacing project.  When the Michael family acquired their home in late 2003, its property taxes were $27,000.00 per year.  Upon completion of the modifications to the residence – pursuant to an intention to make the entire living area easily accessible to Susan – the home was left one-third smaller than before.  Yet upon being reassessed in 2004, after the home had been substantially reduced in size, its property taxes underwent an exponential *increase*, from $27,000.00 to $87,000.00 per year.  On information and belief, such a tax increase in scarcely one year was without precedent in the Village, and was further belied by the miniscule property taxes enjoyed by virtually every other resident in the area.  On information and belief, the vast majority of George's neighbors paid property taxes at a pro rata fraction of such level, while a startling number of Village residents simply paid no property taxes at all – receiving exemptions for reasons that ran the gamut from the absurd to the ridiculous.  The founding family of the Shore Acres Country Club paid three dollars ($3.00) in property taxes on ten acres of real estate, apparently as an honorarium for helping establish such institution.  Another family paid no property taxes whatsoever on a 70-acre estate, in return for growing an infinitesimal patch of corn which was mowed down each year by the gardener.  Property tax exemptions had been doled out to Village residents for such enterprises as hosting wine-tasting sessions, growing non-existent shrubbery, and running a nominal "crisis center" – amounting to a legacy of municipal complaisance toward the established families in the community.  Yet the Michaels saw their property taxes nearly quadruple, following the downsizing of their residence by one-third.  Such disparateness of treatment presaged a similar pattern and practice to follow.

30.     **THE CHAPEL.**   Prior to acquiring their new home in the Village of Lake Bluff, George and Susan had been commuting from northern Cook County to St. Gregory's Church in

Chicago, Illinois, where they had been members for decades. By the summer of 2004, Susan's worsening symptoms had made it very difficult to climb the steps leading up to St. Gregory's, which had no accommodations for the handicapped. The lengthy round-trips were also getting more difficult for both Susan and Dorothy, which did not bode well for an even longer commute once they moved to Lake Bluff. It became clear to George that to insist upon attending services at St. Gregory's, following the family's relocation, would only compromise Susan's chances of improvement in the new environment. Deeply attached to his wife, and determined to give her foreshortened days as much grace as he could muster, George decided to build a chapel in their new home, where they could conduct services within the canon of their faith without the necessity for onerous exertion which could wreak havoc with Susan's and Dorothy's medical conditions.

31. In June of 2004, George hired the noted Architect and Village of Barrington Planning Commissioner Harry Burroughs ("Burroughs") to see whether their home at 1955 Shore Acres Drive could be converted into a church for the Orthodox faith in which the couple had been involved since their respective infancies. Burroughs advised George that the racquetball court could be converted into a chapel, and that other portions of the home could be modified to fit ecclesiastical purposes. George thereupon asked contractor Philip Orzech ("Orzech") to begin working with Burroughs on the fledgling project.

32. **First Notice of the Church to the Village**. On July 27, 2004, Burroughs called the Assistant Village Administrator of Lake Bluff, Brad Burke ("Burke"), to find out if it was necessary to obtain a special use permit to operate a church on the premises of their home. Burke asked Burroughs to submit drawings of the planned religious uses of the premises so that Burke could determine whether there was a need for a zoning variance. Burroughs prepared a series of drawings showing a chapel where the racquetball court used to be, as well as a planned cathedral

room and pastor's study in other rooms of the home. In September of 2004, Burroughs delivered

these drawings to the Village, as Burke had requested. Upon dropping off the drawings, the

Village receptionist accepted the documents without issuing any receipt, which struck Burroughs

as highly irregular.

33. During the following months, George's architect had several conferences with

Assistant Village Administrator Burke about revisions to the plans to convert the residence at

1955 Shore Acres into a church for the family's Orthodox faith. During these conferences,

Burroughs asked Burke again if a zoning variance was necessary for a church to open its doors at

1955 Shore Acres Drive. Burke stated that if a variance was necessary, George would receive

notice from the Building Department. If no such notice was received, they should assume that a

variance was unnecessary.

34. **Additional Sets of Drawings in Village's Hands.** No less than four (4) sets of

revised drawings of the proposed church and chapel were delivered to the Village Building

Department by Burroughs and/or Orzech – such drawings being handed over on July 15, 2005,

October 4, 2005, November 15, 2005, and December 6, 2005. On each of these occasions, as had

happened in the first instance, the drawings were accepted without issuance of a receipt,

bespeaking a municipal practice which Burroughs and Orzech had never encountered before.

35. In January of 2007, with still no word from Brad Burke or the Village as to the

necessity for a special use permit or variance, Burroughs advised George that there was no

municipal impediment to the conversion of the home into a church. Burroughs stated that in his

experience as Barrington Planning Commissioner, as well as over his lengthy career as a working

architect, the municipality would inform the resident about the need for a variance if there was

one. Since the Village had been in possession of the plans and proposals for the conversion of the

home for going on two years, it was quite evident that a zoning variance was unnecessary. Burroughs had green-lighted numerous proposals where municipalities were given considerably less time to make up their minds, without subsequent hassles from the authorities.

36.     Burroughs' opinion as to the permissibility of the projected church spurred George's efforts toward transforming such dream into reality. In or about February of 2007, George and Susan undertook to establish a genuine Armenian Orthodox church in Lake Bluff. Deeply committed to realizing his vision, George set out to obtain his clergyman's license. Not in a position to attend a seminary due to his age and responsibility for his wife and disabled daughter, George enrolled in a program offered by the Church of Spiritual Humanism, which allowed him to become a licensed minister upon successfully completing its curriculum without having to spend numerous years in divinity school.

37.     While pursuing his ordination as a minister, George undertook to modify the property in keeping with Burroughs' plans for the church. The racquetball court built in or about 2004 was converted into a chapel where worshippers could conduct services in the orthodox faith they shared. A cathedral room and pastor's study were brought into being on the premises, and numerous related facilities. The actual dimensions of the Church were the same as the depictions in the drawings which had been delivered to the Village on no less than five occasions.

38.     While the chapel and other facilities were under construction, George undertook to find an appropriate pastor and treasurer for the newfound Armenian Church of Lake Bluff (the "Church"). George convinced a well-known Armenian Orthodox pastor, Fr. Vahram Hazarian, to conduct the services in the chapel. An accountant named Marc Geissler was hired as Treasurer, with administrative responsibilities relegated to George. Within the space of a few industrious weeks, the church George had envisioned was ready to open its doors to the faithful.

39.     On March 22, 2007, the property at 1955 Shore Acres Drive in Lake Bluff, Illinois was conveyed by quit-claim deed to the Church which George and Susan had founded.  Soon thereafter, the Church began to offer religious services to the public.  On April 10, 2007, George filed an Affidavit for a Tax Exemption with the Lake County Assessor's Office, stating that the property located at 1955 Shore Acres Drive was to be utilized primarily as a place of worship and religious instruction in the Armenian Orthodox faith.

40.     Upon the Church opening its doors to the public, a congregation of like-minded worshippers began to appear at the new chapel where Reverend Hazarian conducted services and devotions.  Thanks were offered for the opportunity to attend an Armenian Orthodox chapel at a reasonable proximity to the congregants' homes.  Robert Michael proudly drove in from his residence in Cook County to attend the services, gleaning as much satisfaction from the proceedings as George derived from his involvement as assistant pastor and administrator.

41.     **Improvement in Susan's Health.**  As the Church began to establish itself, Susan's general health and physical condition underwent a remarkable improvement.  Although there was a range in the symptoms of MS which allowed for a few sufferers to attain a degree of functionality somewhat approaching normalcy, Susan's medical history was scarcely indicative of such a possibility.  By the summer of 2007, astonishingly, Susan was no longer displaying signs of *degenerative* MS; she had regained the ability to walk, without relying on a walker; she was climbing steps again; her energy, stamina, and outlook had all vastly improved.  Surprised and impressed with her improvement, her physician took her off of the grueling interferon injection treatments which George had been dutifully administering for years – thus relieving her of its deleterious side effects and further revitalizing her constitution.

13

42.     Whether Susan's improvement was due to the lakefront vista and its salubrious effect on her health, or to the intramural proximity of a chapel where she could worship in the faith she cherished without a continuum of tortuous discomfiture, George was overjoyed at her progress, as was Robert, who was Susan's distant relative and had known her all his life.

43.     **THE DECK.**   Upon the Michael family moving into the premises at 1955 Shore Acres Drive, the sole access to the beach had consisted of a crude stone stairway at the end of the property, leading down the eponymous bluff on which the home was situated to the lakeshore below.  Having moved to such location to allow his wife to obtain the physical and psychological benefits associated with littoral environments, George realized that effectuating better access to the beach level was a priority.  In the spring of 2005, George built another stairway to the shore, situated nearer to the home.  George constructed a wooden deck at the base of the stairway, and an electric tram to carry Susan to such destination on those days when the steeply angled steps were too much to handle.  Notice was afforded to the Village of the stairway, deck and tram.

44.     The Village never requested a permit for the new stairway or deck, only for the electric tram.  Watching Susie's expression as she took her first ride in the tram, moving to Lake Bluff seemed the right choice after all.  In May of 2005, after the work was finished, George received a call from Building Code Supervisor Andy Orsini ("Orsini"), which put a different spin on the situation.  The official told George that the bluff needed to be restored in the vicinity of the stairway; and that the "only company" approved for the job was Horvath Co., owned by a buddy of Orsini's.  Having confirmed that no Village inspectors had witnessed any phase of the work, George pointed out that the bluff had been left untouched by his workers.  Orsini responded that it was Village policy to restore the bluff when work was done, and that he "won't know what hit [him]" if he bucked the tide.  Fearing that Orsini might declare the deck off limits just when

14

Susan was starting to improve, George reluctantly did as Orsini had directed. Horvath Co. proceeded to charge approximately $11,000.00 for planting eight bushes. On information and belief, the same work could have been done for a fraction of that sum by a dozen companies. In or about the summer of 2005, the Village Board approved the deck, new stairway, and tram.

## III.  DISPARATE TREATMENT, SECOND PHASE:

45.     In or about January of 2006, George and Susan decided to build an extension to the detached garage – thus unwittingly encroaching upon an episode of harassment that would turn their lives into a nightmare. Knowing that the Village would want to review the architectural drawings before a permit was approved, George asked Burroughs to prepare the same.

46.     In early February of 2006, Burroughs delivered a set of drawings to the Building Department, depicting the planned extension to the garage. Since no work was going to be done to the facilities inside the structure, the pre-existing shower and kitchenette were not depicted. As had occurred on five previous occasions, the Village representative accepted the drawings while issuing no receipt or proof of acceptance. Again, Burroughs was unsettled such a practice, which afforded the visitor no means of proving that such documents had been placed in Village custody.

47.     On or about February 5, 2006, George applied for a permit for the proposed extension to the detached garage, paying all requisite fees.

48.     On February 9, 2006, Village Supervisor Orsini sent out a letter in response to George's application. Orsini stated that two building permits, as well as a zoning variance, were required for the limited work which George had proposed. Orsini ended the letter by scolding George for having an "accessory structure" [i.e., the detached garage] on the property which was "not permitted" under the Building Code – giving the impression that Orsini believed the structure had been built by the current residents, as opposed to having existed for over 75 years.

15

49.     After receiving the aforesaid letter from Orsini, George called him up and explained that the detached garage had come with the property, and dated back to the 1930's. George had the impression that Orsini was not bothering to listen. Orsini thereupon thanked George for "expressing your opinion," and advised him that the process to obtain permission for the extension might take "a helluva long time" due to the need for relief from two departments.

50.     Afforded a preview of an exhausting set of Village requirements, which seemed premised on the absurd notion that a 75-year-old garage in the front yard was a big surprise for the Village authorities, George and Susan decided to withdraw their application.

51.     During the summer of 2006, a tree on the Michaels' property was struck by lightning and fell onto the detached garage. The damage to the garage was extensive, leaving the interior open to the elements. George undertook to repair the damage, adding a small addition that sufficed to strengthen the structure. George did not touch the pre-existing shower, sink, toilet or kitchenette, but left them exactly as they were. Nor did George add any bathing facility to those present. As a consequence of such addition, the front and back yard setbacks from the adjoining line were taken out of conformity with Village Code. On July 6, 2006, the work on the detached garage was finished.

52.     On September 27, 2006, Village Zoning Technician Dana Cohen ("Cohen"), accompanied by several Village officers, appeared at the Michaels' residence with a Stop Work Order, demanding that all work on the detached garage cease immediately. George not being at home, the group confronted Susan, cornering her inside the door as Cohen handed her the Order. Confused and frightened, Susan stated that as far as she knew, no work was going on, and that Cohen was free to look inside the detached garage to see for herself. Cohen proceeded to affix

thirteen (13) stickers to the exterior of the detached garage, while never accepting Susan's invitation to enter the structure.

53.     On September 28, 2006, George called up Cohen and asked what could be done to resolve the situation, where a Stop Work Order was issued for work that had ceased months earlier, with stickers everywhere that he was afraid to remove.  Cohen stated that George would have to take up the matter with Code Supervisor Orsini, once the latter returned from his vacation.

54.     On or about October 9, 2006, George contacted Orsini upon the latter's return and explained the situation.  Orsini stated that he needed to inspect the detached garage, whereupon an inspection was scheduled.  Mindful of his wife's reaction to the officers who had confronted her on the 27th – triggering symptoms of Autonomic Dysfunction that had taken many minutes to subside – George asked if Orsini could avoid a display of weaponry when arriving at his residence, due to his wife's susceptibility to cardiac complications when subjected to stress. Orsini assured George that "no armed cops" would be showing up at his doorstep.

55.     On the appointed date and time, Orsini appeared at the property for the inspection. Despite his assurance to George, Orsini was accompanied by an armed officer, gripping the holster of his weapon though called to the scene of a domestic disturbance.  Upon George answering the doorbell – having seen no need for Susan not to accompany him – the sight of the aggressively-posed officer was sufficiently alarming to cause her to stagger backwards.  Stepping into view in the doorway, Orsini stated that it was Village policy to bring along an officer when undertaking inspections.

56.     On or about October 12, 2006, Orsini proceeded to inspect the detached garage. Having arranged for his architect and contractor to be present, George, Burroughs and Orzech accompanied Orsini as he walked around the addition to the structure, then followed Orsini

inside. The three men watched as Orsini scrutinized the pre-existing shower, sink, toilet, and kitchenette. After completing the inspection, Orsini stated that the Village would need revised drawings of the work displaying the front and side yard setbacks, and a new survey. Orsini advised George to apply for a zoning variance for his nonconforming front and back yard setbacks.

57.     On October 19, 2006, George filed an application for a zoning variation. George was informed that his application would not be considered until the supporting materials had been reviewed by the Building Department.

58.     On or about October 19, 2006, George asked Burroughs to prepare revised drawings displaying the front and back yard setbacks, and a revised survey depicting the water run-off, as Orsini had requested. In November of 2006, Burroughs delivered the revised drawings to the Building Department. *In these drawings, the pre-existing shower facility in the detached garage was clearly displayed*. As had occurred previously, the drawings were accepted without issuing a receipt. When Burroughs made a point of asking for one, the Village receptionist stated that "it was our policy" not to give receipts when accepting such documents.

59.     On or about November 28, 2006, Burroughs' revised drawings – displaying the pre-existing shower inside the freestanding garage – were given to Village Zoning Technician Dana Cohen ("Cohen"). for review. On information and belief, Cohen failed and refused to review these drawings with any measure of attentiveness. As the consequence of her willful disregard, Cohen remained unaware that a pre-existing shower was found within the structure.

60.     On or about November 29, 2006, Cohen passed along the revised drawings of the detached garage to one of her assistants. In an accompanying note, Cohen gave credence to the likelihood that such drawings would be lost or misplaced while in the Village's hands:

> I probably don't need to mention this, but **PLEASE** do not
> let these plans out of your hands. If they were somehow to
> disappear, the Village would have no record of what has gone
> on at this address. And nothing surprises me anymore! [2]

61. On or about December 5, 2006, Cohen prepared a page of notes titled "1955 Shore Acres." Having failed to step inside the detached garage while she was at the property, nor troubling to review drawings in which the pre-existing shower was patently displayed, Cohen capped off a display of ostrich-like incuriosity by noting that the detached garage "has heat, light, bathroom facilities. Shower installation could be done very easily without detection."[3]

62. On December 6, 2006, George filed a completed application for front and back yard Zoning Variance relative to the small addition to the detached garage. George stated in the application that "the front yard structure has been there for nearly 80 years."

63. Throughout their interactions with Village authorities arising from the Stop Work Order of September 27, 2006, George and Susan were never told that a per diem fine was being assessed for the addition to the detached garage. Had such information been conveyed to them, George would have immediately dismantled and removed the addition to the structure.

64. In December of 2006, George's appeal of the increase in his property taxes was heard by the Lake County Review Board ("LCRB"), with the Village intervening in opposition. On information and belief, one or more Village officials had previously engaged in ex parte communications with the LCRB in an effort to influence the outcome. Prior to the hearing, George learned that his accountant Marc Geissler, a moral supporter, would not be able to attend. George was represented by attorneys Ben Shapiro [former regional counsel for the FDIC] and

---

[2] References to notes or memoranda prepared by Village officials are based upon documents in possession of plaintiff's attorneys.

[3] Cohen's blinkered misgiving – i.e., the garage could be equipped with a shower, and thus become inhabitable – begged the question that there was a pre-existing shower in the detached garage that dated back to the 1930's.

John Klytta. Upon convening the hearing, it was announced that the appeal was denied. No evidence was taken by the LCRB.

65. **The First Citation.** On December 18, 2006, with no word yet on George's application for a variance, the Village served a Notice of Zoning Violation upon the family. George was stunned to learn that a retroactive penalty of $50.00 per day was being assessed for the 71 days preceding his date of filing [i.e., September 27 - December 6, 2006] for having "an addition to an accessory structure" on the family's property. A total of $3,550.00 was being demanded [71 days x $50.00], in blatant disregard of the fact that George had been engaged throughout that period in meeting the requirements to obtain a variance for that same addition. George could only shake his head in wonderment, knowing that he would have immediately dismantled the addition, regardless of any pending application, had someone mentioned that he was being fined $50.00 for each day the addition remained in existence.

66. In late December of 2006, Code Supervisor Andy Orsini informed George that a permit was forthcoming for the addition to the detached garage. If George paid the fines, Orsini stated, the permit would be issued immediately. The only remaining hurdle would be a hearing before the zoning board, which would go his way. Orsini stated that he had never seen a public hearing that went south, once a permit had been authorized.

67. On or about January 9, 2007, George discussed the fines arising from the December 18, 2006 Citation with Village official Orsini. George came away with a manifest understanding that a payment of $3,000.00 would settle the outstanding fines. Trusting Orsini's assurances, George did not think it necessary to memorialize their agreement in writing.

68. On January 10, 2007, George wrote out a check for $3,000.00, payable to the Village, in settlement of the fines arising from the December 18, 2006 Citation. In the memo

portion, George noted that such sum was in payment for the fines issued for the addition to the accessory structure. George thereupon delivered the check to the Building Department.

69.     On or about January 10, 2007, George was invoiced for the sum of $750.00 by the Village for its postage costs incurred in mailing a Notice of Public Hearing to its residents, relative to his requested setback allowances.

70.     On or about January 11, 2007, on information and belief upon Orsini's directive, the Village released the Stop Work Order issued upon the Michael family on September 27, 2006.

71.     In or about mid January of 2007, Andy Orsini retired. The position of Village Building Code Supervisor was assumed by Gerald Nellessen ("Nellessen").

72.     On or about January 16, 2007, George contacted the new Code Supervisor about the impending permit for the addition to the detached garage. Nellessen told George that he was "not going to touch" anything that Orsini had been working on.

73.     Prior to the January 17, 2007 hearing before the Zoning Board of Appeals, on information and belief, one or more Village officials engaged in ex parte communications with the members of the ZBA in order to sway or influence their vote to George's disfavor.

74.     On January 17, 2007, the Zoning Board of Appeals held a Public Hearing on George's application for front and side yard setback variations arising from the addition to the detached garage. Not a single resident responded to the Notice of Hearing. Nevertheless, the ZBA recommended denial of George's application. Such decision triggered the necessity for a supermajority vote by the Village Board, which was thereupon scheduled for March 19, 2007.

75.     While awaiting the hearing of his application for setback variances by the Village Board, George decided to find out if his neighbors would lend their signatures to a supportive affidavit. Although only one neighbor, Vito Manone ("Manone"), was even theoretically affected

21

by his setback violations, George decided to canvass the community just as the Village had done. Just about every resident he spoke to agreed to sign an affidavit expressing indifference to the front and side yard setback violations due to the addition to the freestanding garage.

76.     George's neighbor Vito Manone was not at home when George came by, nor answered the door when George stopped by subsequently.  A few weeks later – with the Board meeting less than a month away– George received a letter enclosing a favorable affidavit from Manone.  In the letter, Manone apologized for not responding sooner, having been on vacation in Florida for the past four weeks.

77.     On or about January 23, 2007, George's payment in the amount of $3,000 in settlement of the fines set forth in the December 18, 2006 Citation was deposited in the Village's account at Northern Trust Bank.  On information and belief, Orsini's agreement to settle, George's tender of payment, and the cashing and depositing of the $3,000.00 check were all made known to Village President Christine Letchinger in a timely manner.

78.     At the Board Meeting on March 19, 2007, George presented the affidavits of his neighbors expressing their consummate indifference that George's front and side yard setbacks violated a Code provision.  No opposing testimony or affidavits were presented.  Village President Letchinger tabled consideration of the ZBA's recommendations, and directed her staff to levy a substantial fine for the family having constructed a small addition to their freestanding garage during the past summer.

79.     The members of the Village Board thereupon expressed their wish to inspect the detached structure where such unconscionable breaches of Village Code had taken place.  It was resolved that the Board members would come out to the Michaels' property on the afternoon of April 9, 2007, and assemble thereafter for a vote as to the requested variations.

80.     On or about March 21, 2007, on information and belief, Building Code Supervisor Nellessen met with Village Attorney Peter Friedman ("Friedman") to determine an appropriate fine for the Michael family, relative to the addition to the structure. Nellessen and Friedman decided to impose a fine of $12,380.00, which they derived by multiplying an $80.00 per diem fine by 154 days of alleged violations, beginning on July 6, 2006, when the work was ended, to December 6, 2006 when the completed application was filed. Nellessen and Friedman were not dissuaded from such calculations by discrepancies with the terms of December 18, 2006 Citation.

81.     On or about March 28, 2007, Village Attorney Friedman met with the Michaels' counsel George Covington ("Covington") for the purpose of imposing the aforementioned fine upon the family. Prior to such meeting, George had abandoned any hope of enforcing the January 9, 2007 agreement, of which there was no written evidence. Orsini was no longer with the Village, and Nellessen had vowed that he would not honor any pending agreement with his predecessor that was not graven in bronze. George decided it would be far more helpful to try to address the excessiveness of the proposed fine, rather than wave a cancelled check in the air and demand a $3,000.00 credit. At the meeting of March 28, 2007, Attorney Covington registered a protest of the unfounded fine which Friedman and Nellessen wished to impose.

82.     On the afternoon of April 9, 2007, the Board members arrived at 1955 Shore Acres Drive to inspect the detached garage and front and side yard setbacks relative thereto. Village Administrator Kent Street and Assistant Village Administrator Ryan Waller also participated in the inspection. For some unstated reason, Building Code Supervisor Nellessen was not present. George met the officials at the property, assisted by attorney Julia Magnus ("Magnus") from Covington's office. During the inspection, each official appraised the pre-existing room, shower, sink, and kitchenette inside the structure.

23

83.     On the evening of April 9, 2007, the Village Board assembled to consider George's application for front and side yard setback variances.  Before the meeting began, attorneys Covington and Magnus gave a Power Point presentation about the work performed the past July.  To aid the Board members in following the presentation, Magnus handed out copies of Burroughs' revised drawings and land survey.  In both the drawings and survey, the pre-existing shower within the detached structure was plainly depicted.

84.     On the evening of April 9, 2007, following Covington's presentation, the Board meeting was convened.  Following roll call, Village Trustee Geoff Surkamer ("Surkamer") asked plaintively, "Why are we here?"  Trustee Surkamer thereupon remarked that the results of their inspection were sufficiently favorable, in regard to the requested relief, to raise a question about why a vote of the Board was even necessary in the first place.

85.     The Board of Trustees thereupon entertained a motion to grant the Michael family the front and side yard setback variations for which they had applied.  The motion was passed by a unanimous vote.

86.     Village Trustee Rick Lesser thereupon stated that the $12,320.00 fine proposed by Nellessen and Friedman was too high for a zoning consideration, being much greater than the fine imposed for a more substantial building violation.  The Board of Trustees recommended that the Building Department come up with a lesser fine for the alleged violations on the subject property.

87.     On or about April 10, 2007, Village Administrator Kent Street ("Street") consented to "reduce" the total fines to be imposed upon the family to $7,700.00, equating to a $50 per diem penalty for 154 days [i.e., July 6, 2006 through December 6, 2006].  Such a "compromise" included 93 days of retroactive penalties preceding the effective date of the Citation – thus violating due process.  Kent Street stated that the Village could go no lower, while

24

promising that any tender of payment would not be deposited until a permit was issued for the front and side yard setback variations.

88.     On April 17, 2007, George's counsel Covington tendered a cashier's check to the Village of Lake Bluff, c/o Kent Street, in the amount of $7,700.00, in payment of the fine for the family's alleged violations arising from the addition to the detached garage.  In a cover letter, Covington memorialized the Village's stipulation that such payment satisfied "all penalties for zoning and building violations arising out of or related to" the detached structure on the property.

89.     On April 19, 2007, Village Administrator Kent Street deposited the $7,700.00 settlement check in a Village bank account.  On or about April 20, 2007, Street reported to the Village President that all fines imposed for the aforementioned offenses had been paid in full.

90.     Despite Kent Street's promise to George, the Village never issued a permit or Zoning Variance to the Michael family for the front and side yard setback violations on their property, relative to the addition to the garage.

**IV.     DISPARATE TREATMENT, THIRD PHASE:**

91.     On June 26, 2007, the Church's Treasurer Marc Geissler ("Geissler") notified the Village that the Church had purchased the property located at 1955 Shore Acres Drive.  Geissler gave notice that the Church intended to apply for a Non-homestead Property Tax Exemption.

92.     During the remainder of the 2007 year, on information and belief, certain communications were exchanged between Code Supervisor Nellessen and an individual named R. Drew Irvin ("Irvin"), who was angling for an appointment to an executive Village position.  On information and belief, such communications addressed the ethnicity of the members of the Church, and the impact upon the community if such membership continued to grow.

93.     In or about January of 2008, Kent Street resigned or was removed from his position as Village Administrator.  The position was thereupon assigned to Irvin by Village President Letchinger.

94.     On February 1, 2008 – ten days before the scheduled hearing of the Church's application for a Non-homestead Property Tax Exemption – Village Administrator Irvin sent a letter to the Lake County Review Board ("LCRB"), which would preside at the hearing.  Irvin advised the LCRB that the Village was opposing the Church's request for an exemption.

95.     During the next ten days, on information and belief, Irvin and Nellessen engaged in ex parte communications with members of the LCRB, intending to predispose the panel to deny the Church's application for a tax exemption.

96.     On February 11, 2008, the Church's application for a Non-homestead Property Tax Exemption for the 2007 year was heard by the LCRB.  The Church presented a variety of evidence in support of its application to the hearing panel.  The Village argued that the use of the property violated the Zoning Regulations; and amounted to a tax shelter for George and Susan.

97.     On or about February 29, 2008, the LCRB issued a decision denying the Church's application for a non-homestead property tax exemption.

99.     On or about March 13, 2008, the Church filed a petition with the Illinois Department of Revenue (hereinafter "IDR" or the "Department"), requesting that the Church's application for a non-homestead property tax exemption be subject to further review and final determination.

100.    On or about May 27, 2008, George filed an affidavit with the Department of Revenue, stating that the Armenian Church of Lake Bluff had commenced its operations on March 22, 2007.

26

101. **ISSUANCE OF THE EXEMPTION.** On June 12, 2008, after a consideration of the Church's application, the LCRB's decision, and the evidence presented on both sides at the hearing, Director Brian Hamer of the Illinois Department of Revenue issued a Tax Exemption Certificate approving a 78% property tax exemption for the Armenian Church of Lake Bluff for the 2007 year. The 22% differential corresponded to the portion of the 2007 year which preceded the de facto establishment of the Church on March 22, 2007.

102. In the course of rendering his decision in favor of the Church, IDR Director Hamer reviewed the Zoning Regulations of Lake Bluff, which had been submitted by the Village to the Lake County Board of Review, along with the Village's arguments that the Church was impermissible and unauthorized.

103. On or about June 17, 2008, on information and belief, Village Administrator Irvin commenced a campaign to assail or discredit the Armenian Church of Lake Bluff and its representatives, intending by such means to either force to the Church to close its doors, or to somehow effectuate a reversal of the property tax exemption granted by the IDR. In furtherance of such campaign, Irvin called up Illinois State Senator Susan Garrett ("Garrett"), on information and belief a personal friend of Irvin's. On information and belief, Irvin left a message for State Senator Garrett, requesting in so many words that she utilize her contacts and liaisons to try to undo or reverse IDR Director Hamer's decision to award a non-homestead property tax exemption to the Church.

104. On or about June 20, 2008, State Senator Garrett responded to Irvin's voice mail message by means of an e-mail enclosing a hand-written note, along with an article about an unrelated dispute involving the Michael brothers' Realty company. Garrett's note to Irvin stated as follows:

To Drew Irvin [,] From Susan Garrett
Let's <u>talk</u>!

105.    After sending such note to Irvin, on information and belief, Garrett proceeded to keep the implicit promise in its tone and wording, by undertaking her own campaign to nullify the tax exemption accorded to the Church by the IDR.  On information and belief, Garrett commenced to contact certain individuals employed by the IDR, including its Director Brian Hamer, with Garrett thereupon divulging numerous items of misinformation gleaned from her conversations with Irvin in an attempt to convince her listeners that the Department's decision of June 12, 2008 should not be allowed to stand.

106.    **Onset of police surveillance.**  On or about June 20, 2008, on information and belief, Village Administrator Irvin directed Village Police Chief William Gallagher ("Chief Gallagher") to commence surveillance of the alleged Church at 1955 Shore Acres Drive, in order to ascertain if religious services were going on within.

107.    On or about June 21, 2008, on information and belief, Chief Gallagher instructed Deputy Chief Robert Belmondo ("Belmondo") to undertake such surveillance by placing officers on vehicular patrol in the proximity of the property at 1955 Shore Acres Drive.  Belmondo thereupon ordered Village officer Riforgiato to conduct an initial surveillance of the premises.

108.    On June 22, 2008, beginning at or about 8:30 a.m., Officer Riforgiato carried out an initial surveillance of said premises lasting several hours.  Officer Riforgiato reported that no one was observed entering or exiting the driveway during such time.

109.    **The Second Citation.**  On the afternoon of June 24, 2008, Village Supervisor Nellessen, accompanied by an armed officer, undertook to serve a Notice of Zoning Violation (hereinafter "Zoning Citation") upon the family.  On information and belief, Nellessen was aware that Susan was usually alone during weekday afternoons, as was the case on that date.  After

ringing the bell and perceiving no response, it is believed that the 6"4 Nellessen and the officer

went around to the back, whereupon Nellessen pounded upon the sliding glass door which Susan

tended to use when coming and going.  It is believed that Nellessen continued to pound on the

door as Susan came into view, scowling as though about to clap her in handcuffs.  It is believed

that Nellessen thereupon handed Susan the Zoning Citation which the Village Administrator had

prepared, informing her: "You and your husband are in big trouble."  It is believed that Nellessen

thereupon expressed an opinion that Susan's trembling was a sign of her culpability.  Nellessen

and the officer then departed.

110.    **Onerous and Disingenuous Sanctions.**  The Zoning Citation had been issued for

the couple allegedly operating a church in the "County Estate Residence Zoning District" of the

Village, in which only residential use was permitted.  Irvin was imposing a fine of $250.00 per

day for such zoning violation, to be assessed on a renewing basis for each day that the property so

utilized.  On the basis of his affidavit that the Church opened its doors on March 22, 2007,

George and Susan had been charged with continuous violations since that date – amounting to

$115,000.00 in fines.  The Citation stated that such offenses had been willful:

> Each of these offenses was a knowing violation in light of the fact
> that you were informed, but ignored, the Village's notice to you
> that church operations were not allowed on the Subject Property.

111.    The Zoning Citation, which was in the form of an unsigned letter, contained three

misrepresentations.  The Village, so it was stated, "has not granted, nor have you ever applied for,

any relief under the Zoning Regulations that would authorize the use of the Subject Property as a

Church."  This was amounted to a statement both false and disingenuous, since the Village had

never indicated any necessity for a variance throughout the entire planning process in 2004-2006.

The Citation next stated that at the December 2006 LCBR hearing, Geissler was "specifically

informed by the Village" that the Church required "specific zoning relief and Board approval." Geissler was not in attendance at that hearing, nor was such a representation made to anyone else who was there. The Citation lastly referred to the "notification" afforded by the LCBR that the Church was unauthorized. But the Department of Revenue had reversed such outcome on June 12, 2008, resulting in a non-homestead property tax exemption for the same Church that was now being hit with $115,000.00 in fines.

112.    Upon reviewing the Zoning Citation, George sent a letter of protest to Village Administrator Irvin [i.e., as its author], pointing out that no prior notice had ever been given that "a special use permit or zoning variance" was necessary to operate the Church. George stated that all public services at the Church would cease until the matter could be resolved.

113.    On June 27, 2008, Marc Geissler signed an affidavit stating that he was never informed about any necessity to obtain a zoning variance for the Church. George's attorneys Ben Shapiro and John Klytta also signed affidavits to the same effect.

114.    George and Susan thereupon kept their promise to Irvin, making clear to their congregants that they needed to close down the Church for the time being pending the resolution of a legal proceeding.

115.    On or about June 29, 2008, George collected affidavits from his neighbors in regard to the fact that the Church did not offend the community, cause traffic jams or endanger public safety, nor amount to an eyesore due to the cross affixed above the chapel. Having become convinced that the circumambient hostility toward his family emanated from the Village officials and not from its residents, George felt vindicated by the ease with which such affidavits were collected. He hoped some of that clemency might rub off on the municipality.

116.     **THE DEAL WITH THE SCHOOL DISTRICT**.  Upon the issuance of a non-homestead property tax exemption to the Church, on information and belief, Village Administrator Irvin and Village Attorney Friedman decided to fight the Department's decision by presenting objections thereto.  The Village Attorney thereupon investigated the Village's standing to challenge the exemption.  On information and belief, it was learned that since only $2,200.00 in Village tax dollars was at issue – equating to about two per cent (2%) of the dollar value of the Church's property tax exemption – the Village lacked standing to challenge the exemption.  The only way for the Village to file a protest, would be to convince another taxing body to file objections alongside the Village.

117.     On or about June 20, 2008, Irvin convinced Lake Bluff Elementary School District 65 ("School District 65") to join in a challenge of the property tax exemption issued to the Church.[4]  Irvin convinced School District 65 to do so by proposing that the Village pay 50% of the latter's legal fees to be thus incurred.  Upon School District 65 agreeing to participate, there was sufficient standing between the two taxing bodies to enable the Village to intervene, despite the miniscule tax dollars at stake.

118.     On June 25, 2008, the Village, along with its co-intervener, filed objections before the Illinois Department of Revenue to the non-homestead property tax exemption issued to the Church on June 12, 2008.  Such matter was thereupon docketed as no. 08 PT 0024.

119.     Shortly after its initial filings, School District 65 abruptly terminated the services of its counsel Hinshaw & Culbertson LLP, on information and belief due to the amount of legal fees due and owing at an early stage in the proceeding.[5]

---

[4] Upon arriving at such agreement, on information and belief, Irvin prepared the Zoning Citation.  *See* par. 101-103.

[5] on information and belief, even after a 50% contribution by the Village.

120.     On information and belief, Village Administrator Irvin thereupon promised School District 65 that the Village's counsel – the firm of Holland & Knight – would provide legal representation for School District 65 for the duration of case no. 08 PT 0024, for which the Village would pick up the tab.  It is believed that School District 65 accepted such offer, and agreed not to withdraw from the case.

121.     During the following months, Irvin tried to convince another taxing body to participate in the proceeding, cajoling such entities as Foss Park District to join in his crusade. Despite Irvin's promise to pay their legal fees, not a single taxing body other than School District 65 agreed to intervene in the case.

122.     **Additional Efforts by the Village Administrator**.  While engaged in brokering deals with school districts to allow the Village of Lake Bluff to turn the tide on an upstart church with a decidedly unwelcome congregation, Village Administrator Irvin had not turned his back on the responsibility to keep up the pressure on other fronts.  On or about July 1, 2008, Irvin contacted Illinois State Representative Karen May, requesting that she make use of her contacts in State government to help nullify the tax exemption that threatened to make a mockery of his campaign to close down the Church.  On information and belief, State Representative May indicated that she was receptive to such overture and willing to be of assistance.

123.     On or about July 6, 2008, Irvin reached out to a Chicago Tribune reporter named Susan Kuczka ("Kuczka"), who covered events in and around Lake County.  On information and belief, Irvin disclosed a plethora of misinformation about the Church and its representatives to Kuczka, presenting such entity as the scourge of the Village Code, pouring contumely upon George for posing as a pastor while running a business, making fun of him for being a "Reverend" without going to divinity school.  On information and belief, Irvin was delighted to

find that Kuczka was even more opposed to organized religion than he was, while agreeing that the Armenian Church of Lake Bluff was simply a tax dodge conceived by a wealthy Realtor who had buffaloed the Department of Revenue into believing that there really was a chapel inside the lakefront residence at 1955 Shore Acres Drive.

124.    On or about July 10, 2008, Kuczka visited the property on Shore Acres Drive now belonging to the Church, whose operations were in abeyance pending the resolution of the Citation.  Upon returning to her office at Tribune Tower, it is believed that Kuczka called up Irvin and stated with satisfaction that "his little scam apparently did not work" – referring to the fact that the building was devoid of any sign of organized religious activities within.

125.    Kuczka thereafter vindicated Irvin's trust by running a story in the Tribune on the Village's challenge to the "tax break" on a "North Shore mansion" which George had received from the Department of Revenue.  Kuczka did not mention any of the evidence which the Department had reviewed prior to issuing the exemption, nor mentioned that the Village was scarcely losing any revenue due to the "tax break" which its Administrator was opposing.

126.    **The Church Complaint.**    On July 16, 2008, the Village filed a Verified Complaint for Ordinance Violations and Monetary Fines ("Church Complaint") against George and Susan.  The Complaint tracked the statements in the Zoning Citation, alleging that the Church amounted to an impermissible usage of the property for which no zoning relief had been applied for or received.  No mention was made of the five sets of drawings delivered to the Village during 2004-2006, nor of the permission accorded to the project by former Assistant Village Administrator Burke.  The Complaint demanded that a per diem fine of $250 be assessed beginning on March 22, 2007 to the current date.  Irvin verified that the allegations in the pleading were truthful.

127.     On or about July 20, 2008, Code Supervisor Nellessen, accompanied by several police officers, personally served the Church Complaint at 1955 Shore Acres Drive. It is believed that Nellessen was aware of the family's schedule, preferring to serve such papers at an hour when Susan would most likely be alone. It is believed that Nellessen rang the doorbell no more than once, before walking around to the sliding glass door which Susan customarily used when coming or going. It is believed that Nellessen banged on the glass door as Susan came to open it, keeping it up even as he watched her approach with aid of a walker. Upon gaining access, it is believed that Nellessen upbraided Susan for "taking your sweet time." It is believed that Nellessen stated that he was "going to take the furniture" if $115,000.00 was not paid to the Village. Upon the officials departing, Susan was precipitated into an autonomic crisis. Shortly thereafter, she was back on interferon injections due to resurgence of the symptoms which had theretofore been in remission.

128.     On or about July 22, 2008, George contacted his attorney Margaret Borcia, and directed that all Village notices and citations be served henceforth on her office, which would be equivalent to personal service upon a member of the family. George told his counsel to convey this to the Village authorities, and to emphasize that under no circumstances were Village officials to serve papers at 1955 Shore Acres Drive. His counsel assured him that she would immediately convey such information to the Village.

129.     **THE SECOND INSPECTION.**   On November 11, 2008, the Village filed a Rule 214 Request to inspect the property at 1955 Shore Acres Drive, in order to (i) inspect the chapel and other religious facilities supposedly located at said address, and (ii) make a final inspection of the freestanding garage to ascertain if cause existed to revisit the issues which had been settled the previous April. The Village Attorney was granted leave to take photographs at the inspection.

130.    On November 24, 2008, assistant Village administrator Ryan Waller ("Waller"),

Village Attorney Peter Friedman, and Friedman's associate Andrew Fiske ("Fisk") engaged in an

inspection of every portion of the property at 1955 Shore Acres Drive.  Again, Code Supervisor

Nellessen elected not to participate.  In the course of the inspection, the Village representatives

inspected (i) the chapel, cathedral room, and other religious-related areas; (ii) the exterior and

interior of the detached garage, ***inclusive of the pre-existing shower***, kitchenette, toilet and sink.

The Village Attorney took photographs of the shower and other facilities in the freestanding

garage, in addition to taking snapshots of the chapel and other areas of the property.

131.    During the inspection, Village Attorney Friedman took advantage of the situation

to rummage through George's dresser drawers, grope about beneath the couple's bed, and

scrutinize personal articles of no possible relevance to the tax challenge.  Catching sight of these

antics, George's attorney Margaret Borcia watched in disbelief for a minute or two, then called a

halt to the embarrassing display.

132.    In December of 2008, the depositions of Ryan Waller, Harry Burroughs, and

George Michael were taken by Village counsel Andrew Fisk ("Fisk") in case no. 08 PT 0024.

During Waller's deposition, the Assistant Village Administrator was asked if there were any

unresolved violations regarding the freestanding garage as of the inspection of the property on

November 24, 2008.  Waller testified that as of November 24, 2008, the Michael family was in

compliance with all zoning and permit requirements relative to the detached garage.

133.    In the course of Harry Burroughs' deposition, the architect was asked about the

pre-existing shower in the freestanding garage.  Fisk raised no issue regarding any zoning

violations, merely querying Burroughs about such factual matter in passing.

134.    During the deposition of the plaintiff, George was presented with a sheaf of

photographs taken during the November 24, 2008 inspection. Fisk directed George's attention to a photograph of the shower, again treating such matter as an undisputed fact:

> Q.    The next page is a picture of what?
>
> A.    A picture of the washroom with the door open.
>
> Q.    Is this in that same detached building?
>
> A.    It is.
>
> Q.    *And that washroom has – Is that a full bath?*
>
> A.    *Stand up shower.*
>
> Q.    Thank you. The next picture is a picture of the oven [in the detached garage]?
>
> A.    Correct.

(emphasis added)

135.    **The Weight of the Evidence.**   In the course of case no. 08 PT 0024, the Village presented no evidence or testimony to contradict the Church's showing as to the religious purposes and activities which it fulfilled or presented during the period which preceded the challenge of its non-homestead property tax exemption and the Village lawsuits which followed. The Village never called former Assistant Village Administrator Brad Burke as a witness, a willful omission which suffices to validate [if such was necessary] the testimony of such witnesses as Harry Burroughs and Phil Orzech as to the prolonged gestation of the Church and the manifest permissiveness which the Village accorded throughout such period to the Church. Beyond question, the weight of such evidence vindicated a decision by the Director of the Department of Revenue upholding the property tax exemption issued on June 12, 2008 to the Church.

136.     **EX PARTE COMMUNICATIONS TO BRIAN HAMER.**   In or about the autumn of 2008, the Illinois Department of Revenue appointed Hearing Officer Kenneth Galvin to hear evidence on the objections filed by the Village of Lake Bluff and the co-intervening school district to the issuance of a non-homestead property tax exemption to the Church.  During the same period, on information and belief, ex parte communications were going on between Director Brian Hamer of the IDR and a State of Illinois political insider.  It is believed that subsequent ex parte communications were made to Hamer in March of 2009 by members of a law enforcement agency.  *It is believed that one or more of these ex parte communications to the Director of the Department of Revenue effectively decided case no. 08 PT 0024 in advance*, by causing Hamer to reconsider the property tax exemption which he had issued to the Church in a behind-the-scenes and unauthorized manner.

137.     Beginning in or about July of 2008, on information and belief, Illinois State Senator Susan Garrett engaged in ex parte communications with agents and representatives of State government, with the intent to bring about a reconsideration of the Non-homestead Property Tax Exemption which the Department of Revenue had issued to the Church on June 12, 2008.

138.     Commencing in or about August of 2008, it is believed that Garrett engaged in ex parte communications with IDR Director Brian Hamer, regarding her distorted and mistaken perception that the Armenian Church of Lake Bluff was not a bona fide place of worship, nor deserved the tax exemption which had been granted to the Church.  It is believed that Garrett made such misstatements to Hamer in order to persuade him to reconsider the Non-homestead Property Tax Exemption issued to the Church on June 12, 2008.  On information and belief, Hamer was initially unwilling to reconsider or reverse such exemption, due to the evidence of record which had supported the Department's decision.

37

139.   **Ex parte communications with the FBI.**   In or about February of 2009, it is believed that a Village official contacted the FBI with purported "tip" about George, as a mode of retaliation against the Church for the non-homestead property tax exemption issued the previous June.  It is believed that said official thereupon conveyed false and perjured misinformation to the FBI, claiming that George had conveyed bribes to State legislators in exchange for the exemption.  On information and belief, this same official thereafter contacted the IRS with another "tip" regarding the Church's administrator, doing so from the same retaliatory motive which had occasioned his [or her] call to the FBI.

140.   During the first week of March of 2009, as a consequence of the "tip" from the vindictive Village official, George received a visit from FBI agents Richard Tipton ("Tipton") and Andrew Hickey ("Hickey").  Agents Tipton and Hickey proceeded to ask George if he had bribed one of two Illinois State Senators [neither being Garrett] in exchange for the Church receiving a tax exemption.  George vehemently denied such accusation.

141.   In March of 2009, on information and belief, Agents Tipton and Hickey questioned Director Hamer of the Department of Revenue in regard to the alleged matters about which they had queried George.  On information and belief, as a consequence of being questioned by the FBI after hearing similar balderdash from State Senator Garrett, Hamer decided to reconsider the non-homestead property tax exemption issued to the Church.  It is possible that Director Hamer took such a step to preclude additional questioning on more sensitive issues.

142.   On or about March 20, 2009, it is believed that Director Hamer conveyed his aforementioned decision to Village Attorney Friedman in a confidential and ex parte manner.  It is believed that the Village Attorney thereupon prepared a Motion for Summary Judgment, in order to have the Motion on file when the Director officially reversed the tax exemption.

143.     On March 24, 2009 – on which date the Church's non-homestead property tax exemption remained in effect – the Village Attorney filed a Motion for Summary Judgment in case no. 08 PT 0024, surely an incongruous remedy by which to undo a status quo favorable to the opponent.

144.     In late March of 2009, the Church's attorneys filed a Motion for Summary Judgment in case no. 08 PT 0024, requesting that its non-homestead property tax exemption be upheld due to the inappositeness of the objections to the basis for the Department's decision.  At all times while so engaged, the Church's attorneys were entirely unaware that their tax exemption was about to be reversed, due to behind-the-scenes, ex parte communications which had sufficed to deprive case no. 08-PT-0024 of any semblance of fairness.

145.     **THE REVERSAL OF THE EXEMPTION.**   On April 21, 2009, before the Hearing Officer had heard argument or made any recommendations or rulings on the pending motions for summary judgment, Director Hamer issued a document entitled "Denial of Non-homestead Property Tax Exemption," conveying the news that he, Director Hamer, had reconsidered the non-homestead property tax exemption he had previously issued to the Church (hereinafter the "Reconsidered Certificate").  In the Reconsidered Certificate, it was stated that based on the "statement of facts and supporting documents" in the Church's application, the Department was denying the requested exemption for two reasons, stated as follows:

> Property not in exempt ownership.
> Property not in exempt use.

The Reconsidered Certificate failed to mention that a non-homestead property tax exemption was issued to the Church on June 12, 2008, based upon the identical facts and documents.

146.     Prior to April 21, 2009, no director of the Illinois Department of Revenue had ever reconsidered a property tax exemption without reviewing any new evidence.

147.    On June 19, 2009, the Church's attorneys sent a letter by overnight and certified mail to Director Hamer, requesting a hearing to protest the Department's reversal of its June 12, 2008 decision.  No response was ever received to this letter.

148.    On July 8, 2009, Director Hamer sent out a "Notice of Decision," wherein Hamer claimed to adopt an Order entered by Hearing Officer Galvin, granting the Village's Motion for Summary Judgment, and denying that of the Church.  The "Notice of Decision" indicated that the matter was considered closed.

149.    As of the date when Director Hamer's "Notice of Decision" was mailed out, the Church's attorneys had not received any notice that a summary judgment order was issued by the Hearing Officer.

150.    In August of 2009, the Church's attorneys filed a Request for Rehearing of the Director's decision to reconsider the tax exemption previously granted to the Church.  Since case no. 08 PT 0024 had been closed, the pleading was assigned a new docket number of 09 PT 0063.

151.    In September of 2009, the Department of Revenue moved to dismiss case no. 09 PT 0063 due to the purported *res judicata* effect of the decision in case no. 08 PT 0024.  As of the filing of the motion to dismiss, on information and belief, the purported decision of the Hearing Officer had not been received by the Church's attorneys.

152.    On October 30, 2009, the Department filed a Reply in support of its Motion to Dismiss.  In substance, the Reply was comprised of the Hearing Officer's long-awaited decision on the cross-motions for summary judgment, attached thereto as an exhibit.  The 29-page decision bore a date of July 6, 2009, and purported to address the facts and controlling law relative to the cross-motions.  On the last page, it was stated that the Village's motion for summary judgment was granted, and that of the Church was denied.

153.    Prior to receiving the Department's Reply, the Church's attorneys had never received any decision by Hearing Officer Galvin in case no. 08 PT 0024.

154.    In the "July 6, 2009" decision by the Hearing Officer, there was no mention that a non-homestead property tax exemption was issued to the Church on June 12, 2008 and remained in effect for ten months thereafter.  Nor was it mentioned that the Director had reconsidered his granting of such exemption.  Numerous, comparatively minor facts were duly noted in the decision.

155.    In approximately September of 2009, George was cleared of any suspicions of misconduct by the FBI.  On September 29, 2009, George also received a letter from the IRS, stating that he was no longer subject to investigation.  On information and belief, said investigations terminated due to the inability to corroborate a single accusation of the vindictive Village official with a scintilla of fact.

156.    On December 1, 2009, the Church's Request for Hearing was dismissed with prejudice by Hearing Officer Kenneth Galvin, pursuant to the supposed *res judicata* effect of his decision dated July 6, 2009.

157.    **Unexpected Consequences for the Village.**   The Village of Lake Bluff incurred a vast amount of legal fees in challenging the property tax exemption issued to the Church, such fees on information and belief exceeding $100,000.00.

158.    On information and belief, upon the resolution of the proceeding in the Illinois Department of Revenue, Village Administrator Irvin and Village President Letchinger were confronted with a dilemma for the coming year.  It is believed that the Village's expenditures for legal fees in opposing the property tax exemption had depleted the municipal treasury.  Irvin and Letchinger were thus faced with the challenge of replenishing the treasury.

41

## V.  DISPARATE TREATMENT, FOURTH PHASE:

159.    In September of 2008, at which time the proceedings in the Department of Revenue were yet unresolved, a relatively minor matter arose in another context, *which would eventually help provide the Village with a solution for its depleted coffers*.  As of such date, Susan's degenerating condition was making it difficult for her to use the deck, theretofore one of her few pleasures in life.  Her worsening symptoms had been the consequence of encounters with such officials as Building Code Supervisor Nellessen, a 6"4 individual with a penchant for aggressive confrontations at the property.  On each occasion when Nellessen had served papers upon her, he had sought to intimidate the physically challenged and diminutive woman in a manner that went far beyond the requirements of procedure.  The Village surveillance had also contributed to Susan's worsening prognosis, due to the increasingly disruptive nature of the patrols.  On Sundays, a squad car would come roaring up the driveway, blaring its horn in an effort to disrupt the religious services presumed to be going on inside.  A Village fire truck would follow, trebling the decibels of its predecessor, causing the ceiling fixtures to tremble as it drove up and down the driveway.  Deeply unsettled by these intrusions, Susan's Autonomic Dysfunction was causing her condition to rapidly deteriorate.  Her former diagnosis of remitting-remission Multiple Sclerosis had degenerated into fully progressive MS, deeply disappointing her doctors who had believed that her condition might remain in remission for years to come.

160.    In or about September of 2008, George acquired a wheelchair for Susan to use as needed, despite her resistance to being treated as an invalid.  It soon became clear that such provision did not eliminate the problem of accessing the deck, since the raised deck was not adjacent to the tram but several feet away.

161.    George realized that he needed to build a handicap ramp between the tram and

existing deck, so that Susan could reach the deck while using the wheelchair. It was the perfect solution to the problem, and needed to extend for only a few feet to bridge the gap between the tram and the deck. The ramp would not cause the deck to protrude any closer to the shore, nor to the bluff – incurring not even a theoretical likelihood of a Village grievance, since the deck itself had not required the issuance of a permit in the first place.

162.    In September of 2008, George added a handicap ramp to the deck which the Board had approved two years earlier. The work was completed on the morning of September 25, 2008, enabling his wife to access the structure he had built expressly for her benefit during the few days of clement weather that still remained. George was proud of himself for a task well done, which ran no risk of incurring the wrath of a Village inspector. His neighbors to the north had installed a beach house far closer to the water's edge, without occasioning any censures from Village officials. Even more to the point, the Village Board had approved of the deck, which had merely been modified to become handicap-accessible. George ensured that the deck had been made fully accessible to Susan's wheelchair, then left to go to work.

163.    **THE SECOND STOP WORK ORDER.** On the afternoon of September 25, 2008, Building Code Supervisor Gerald Nellessen, accompanied by two officers, appeared at 1955 Shore Acres Drive with a Stop Work Order in regard to the handicap ramp installed earlier that day. In disregard of George's earnest request that all papers be served upon his attorneys, it is believed that Nellessen approached the property, rang the doorbell once, and proceeded to the rear where Susan could usually be seen moving with her walker inside. It is believed that Susan's peace of mind was sundered by Nellessen's assault on the back door. It is believed that Nellessen could see her approaching, yet continued to pound on the door. It is believed that Susan's heart rate thereupon dropped rapidly, triggering further autonomic symptoms which were impossible to

control once initiated. It is believed that Susan managed to undo the lock, whereupon Nellessen slid the door open under his own power. It is believed that, after handing her the document, Nellessen stated that the couple would have to pay "big fines" and "go to jail" for having built an "addition to the deck." It is believed that Susan began to panic at the thought of being incarcerated, whereupon the symptoms began to intensify. Nellessen thereupon demanded that Susan sign another Stop Work Order as proof that she had received the first one. Susan was barely able to scrawl out her initials "SM" due to the trembling of her hands. An autonomic crisis immediately followed.

164.    This latest Stop Work Order stated that George and Susan had violated the Village Building Code by constructing "an addition to the existing deck" without (i) submitting construction documents to the Village ["R 106.1"] and (ii) obtaining a building permit. Due to such alleged violations, they were facing daily fines of "not less than $25.00 and not more than $750.00," "an imprisonment not exceeding 30 days," "or both." The Stop Work Order had been prepared and signed by Nellessen.

165.    Upon getting a distress call from Susan, George raced home to find his wife barely recovering her ability to speak without gasping for breath. He was confounded by the Stop Work Order, which had taken selective enforcement to a whole new level. Requiring no permit when the deck was built, he was now being hit with a threat of incarceration for adding a handicap ramp to the approved structure. The ramp did not cause the deck to extend an extra millimeter toward the shore, which was left untouched by both deck and ramp. The Code provisions cited by Nellessen either proved not to exist ("R 106.1") or had no relevance to the situation.

166.    **Unprecedented requirements.**  On September 26, 2008, George contacted Nellessen's office, upbraiding him for disregarding a directive to serve Village papers upon his

attorneys. Nellessen told George that he had "forgot" about such instructions. Nellessen thereupon advised George, relative to the ramp, that an application for a permit had to be filed, and no less than four sets of drawings delivered to the Building Department. However, it was first necessary to obtain expert verification that the ramp did not violate any applicable "wetland requirements." The Village would not accept the drawings until receiving such verification. George remonstrated that wetlands requirements were surely irrelevant to a handicap access ramp to a deck approved by the Board. Nellessen responded, "That was then, this is now."

167. Having been given no alternative, George had no choice but to negotiate the obstacle course which Nellessen had laid out for him. Anticipating a snag if he hired an expert on his own initiative, George contacted Village Hall anonymously and asked for the name of the company that the Village utilized for wetland studies. Hey and Associates was the answer given. George thereupon retained the noted firm of Hey and Associates, Inc. to ascertain which if any of the wetland requirements were applicable to the handicap ramp to the deck.

168. On October 6, 2008, a Village representative came out to the property to re-inspect the ramp built the previous month. As the official was doing so, two workers were engaged in bringing a gas grill down to the deck, using the ramp to cross from the tram to the approved structure. The official noted such activity and departed.

169. On October 7, 2008, a Village officer appeared at 1955 Shore Acres Drive and proceeded to walk around the property, peering into windows. Susan was alone, and was frightened by the officer's behavior. Espying Susan, the officer banged on a window, holding up a citation. It is believed that Susan's heart rate commenced to precipitously decelerate as she moved toward the door [the officer not bothering to ring or knock] to initiate yet another confrontation. The officer thereupon handed her a Citation, from the Village Administrator, for

violating the September 25, 2008 Stop Work Order.  The Citation stated that a renewing $300.00 daily fine was being assessed for the 13 days, beginning on September 25th to October 6, 2008, during which impermissible "work" was supposedly going on regarding the ramp [i.e., two men carrying a gas grill to the wooden deck one afternoon].  If the $3,900.00 fine was not paid within ten days, the Village reserved the right to impose a bigger fine.

170.    On or about October 8, 2008, outraged by the Village's continuous disregard of his directive to serve papers on his counsel and not upon his ailing wife, George sent a letter to his attorney Margaret Borcia ("Borcia") reiterating that all Village paperwork was henceforth to be served on her office as a personal agent for the family.  Having alerted the Village about the previous request, Attorney Borcia assured George that she'd relay the directive to every conceivable Department at Village Hall.  Borcia also apprised the Village that their inspector had mistaken a gas grill for "work" on the handicap ramp, demanding that the Village drop all charges stemming from such misunderstanding.

171.    On November 13, 2008, Hey and Associates, Inc. [the wetland experts whom the Village had suggested] sent a rather emphatic report to George, making clear that the addition to the deck was exempt from wetland requirements.  The firm indicated that such an alleged issue – wetland requirements relative to an extension to a deck – had never been raised previously by any municipality.  On November 19, 2008, George's architect Harry Burroughs faxed the firm's report to the Village Building Department, prior to dropping off the four sets of drawings which Nellessen had requested.

172.    **Fourteen Additional Requirements.**   On December 3, 2008, Building Code Supervisor Nellessen sent a letter to Harry Burroughs which sufficed to clarify, if any clarification was necessary, that this was just a game in which the rules were changed at the whim

46

of the opponent. Having previously told George that all that was necessary was to obtain a verification as to wetland requirements – perhaps under the assumption such matter would keep George occupied for many satisfying months – Nellessen had now itemized an additional fourteen requirements before George could be allowed to take a breather in regard to the ramp. George was now required [*inter alia*] to (i) attach headers to the supporting posts of the ramp using "approved steel connectors;" (ii) ensure the compliance of the ramp with the Americans with Disability Act, as adopted in Illinois; (iii) ensure that "no open cut areas" were visible in the surrounding bluff; (iv) add joist hangars and approved handrails to the ramp – which extended for but a few feet and scarcely amounted to a blip on the local horizon. Such impositions sufficed to clarify that Nellessen's absence from two consecutive inspections – where it might be expected that an official would see little to warrant any Village concern – was hardly inadvertent.

173. On reviewing Nellessen's December 3, 2008 letter, George was sufficiently disheartened to almost give up on any notion of a compromise with the Building Department and its willfully unreasonable representatives. A community which he had hoped would prove to be a Godsend for his ailing wife had turned out to be municipal nightmare of ever-changing demands and requirements, while the ethnically neutral residents were coddled by Village officials who believed in soaking the newcomers. George's attorneys sent a communication to the Building Department, requesting that a permit be issued for the innocuous ramp, and/or that Nellessen revise his latest list of demands in keeping with the dictates of fairness and common sense. Harry Burroughs asked Nellessen if any additional revisions to the drawings might help obviate the excessiveness of such requirements. No response was received to these communications.

174. The non-issue of the handicap ramp was thereupon put aside by the Village for approximately one year, coinciding with the duration of case no. 08 PT 0024 in the Department of

47

Revenue. During this period, George remained in a state of noncompliance with a few of the requirements which Nellessen had lately imposed, due to the disproportionateness of such demands in connection with an innocuous little ramp [leading to a municipally approved deck] coupled with inherent uncertainties afforded by Nellessen's phraseology which seemed to rule out any finality or endpoint to compliance.

175.    In or about October of 2009, as the direct result of a campaign of harassment and obstructionism by the Village authorities, the lakefront property at 1955 Shore Acres Drive was listed for sale. Having come to Lake Bluff to find a safe haven for a beloved spouse afflicted with a condition inherently responsive to environmental stimulus, George had seen his wife's health worsen beyond all misgivings, by and though a series of confrontations which he would have regarded as next to impossible when the family first arrived in the community.

176.    In or about October of 2009, the Village found a way to resurrect the non-issues of handicap ramp, pre-existing shower, and Church in another context, that of finding a means to replenish the municipal funds which had been expended to pay its legal bills in the proceedings in the Department of Revenue. This last phase of Village activities is summarized below.

## VI.    DISPARATE TREATMENT, FIFTH PHASE:

177.    In or about October of 2009, on information and belief, Village Administrator Irvin was concerned about the amount of legal fees that the Village had incurred in its challenge of the Church's erstwhile tax exemption, which IDR Director Hamer had obligingly reconsidered without hearing new evidence. Considering that the tax dollars at stake for the Village amounted to $2,200.00, Irvin's animus against the Church and its representatives had cost the Village far more in legal expenses [on information and belief, perhaps fifty times more] than the sum of the tax dollars that the Village had stood to lose.

48

178.    On information and belief, Irvin thereupon conceived a scheme whereby the Village could be recompensed for the legal expenses which the tax challenge had incurred to its treasury.  It was decided that the Village would pursue the three grievances against the Michael family [i.e., Church, shower and ramp], in so doing to take advantage of certain policies and practices of the Village to ensure that a maximum amount of fines could be imposed on George and Susan.  Such fines would be a fitting mode of recompense, since it was their Church which had occasioned the tax challenge.

179.    **THE CITATION FOR THE SHOWER**.  On October 20, 2009, in furtherance of the aforementioned scheme, Irvin prepared a Notice of Zoning Violation ("Shower Citation"), addressed in letter format to "Reverend Michael" in a flourish of would-be sarcasm.  Irvin started by saying that he had recently come across a listing for the property at 1955 Shore Acres Drive, in which the property was described as having a detached structure with a "studio unit, full bath and kitchen."  Insinuating that it was surprising news that a shower was found in the freestanding garage, Irvin quoted a section of the Zoning Regulations:

> Living quarters shall not be permitted in an accessory building. An accessory building or structure shall be considered to have living quarters if an accessory building or structure has heat, light, and bathing or shower facilities.

Having cited the provision of the Code which would be applicable to shower facilities in a freestanding structure, Irvin proceeded to tell a staggering lie:

> The bathing or shower facilities that have been constructed within the accessory structure are violations of Lake Bluff Building Code *because they were not included on any plans that you or your contractors submitted to the Village*[.]

As a consequence of such violation, the family was being assessed a per diem fine of $500.00 for each day that a shower or bath had existed in the detached garage, amounting to a total sum

demanded of $577,500.00. If no steps were taken to bring the structure into compliance with the Zoning Regulations, the Village would take appropriate action.

180. On October 22, 2009, Irvin had the Shower Citation served upon the family at 1955 Shore Acres Drive, thus flouting George's directive to desist from serving papers at the property where his medically afflicted wife had been precipitated into autonomic crisis by the confrontations. By a rare stroke of good fortune George was on the premises when the server arrived that afternoon, and was able to accept service before the emissary had the chance to start banging on the back door. The Shower Citation included a Service List, with the uppermost name being none other than Attorney Margaret Borcia, the representative whom George had authorized to accept personal service on his behalf. Irvin had followed George's request to serve papers upon his attorney, and had thereupon sent a process server to the family's front door as a contemptuous lesson in having the temerity to make a special request of the authorities.

181. George was staggered by the brazen misrepresentations in the October 20, 2009 citation, no less than by the mammoth sum of $577,500.00 demanded therein. The Village Administrator had confabulated two knowing misstatements in a single context, in a determined attempt to saddle the family with as onerous a penalty as possible. George was accused of having constructed the stand-up shower in the detached garage, an untruth which was then compounded by a second accusation that he had refused to include depictions of the shower in the drawings filed with the Village. Any one of these fabrications would have been daunting enough, but to have utilized two such egregious lies in unison betokened a plan or pattern with evident purpose.

182. **THE VILLAGE'S REIMBURSEMENT PLAN.** In or about late October of 2009, there is reason to believe that the Village Administrator, Village President, Building Code Supervisor, and Village Attorney were in process of formulating a praxis by which to effectuate

the reimbursement of the Village's legal fees incurred in cases no. 08 PT 0024 and 09 PT 0063
(hereinafter the "Reimbursement Plan"). On information and belief, it was resolved and decided
by and between said representatives that an approach utilizing (i) certain pending fines issued
upon the Michael family, while also (ii) commencing new actions against them whenever
possible, would present a means of achieving such goal. It is believed these representatives were
all the more encouraged in such objectives, since the Michaels had "caused" the fees to be
incurred in the first place by provoking Irvin's wrath by opening a Church, were racially,
religiously, and ethnically undesirable, and presented a risk to the community since they tended to
attract other Armenian Orthodox individuals into a carefully monitored upscale suburb that was at
least 95% White Anglo-Saxon and Protestant denominational, and not desirous of any changes.

183. In late October of 2009, there is reason to believe that it was decided, by and
between these representatives, that certain Village policies or practices would afford a convenient
and effective means of prevailing over George and Susan in each lawsuit or grievance, thus
obtaining the means to replenish the treasury:

(a)     the Submission Policy, requiring at least one set of blueprints, plans or drawings
        to be delivered to the Building Department as a condition precedent for Village
        approval of the project;

(b)     the No-Receipt Policy, forbidding the issuance of a receipt for any of the
        blueprints, plans or drawings submitted to the Building Department under
        the Submission Policy;

(c)     the Transfer Policy, whereby any and all blueprints, plans and drawings
        submitted to the Building Department were sent to a storage facility in the
        municipality of Lake Forest, Illinois.

184.    Beginning in or about late October of 2009, on information and belief, Village
Administrator Irvin, Village President Letchinger, Building Code Supervisor Nellessen, and
Village Attorney Friedman came to a mutual understanding, namely to falsely state, allege,
depose, or testify that the Village, by and through its agents end employees, possessed no record
or recollection of at least eight (8) sets of architectural drawings which had been delivered by
George's agents and delegates to the Village Building Department during 2004-2007.  The sets of
drawings [or revised drawings], the existence of which, so it is believed, these representatives
were thus intending to suppress, deny, disown, or expunge were as follows: (i) the first set of
Harry Burroughs' drawings of the proposed Church, which Burroughs delivered to the Building
Department in September of 2004; (ii) the four sets of revised drawings of the Church, which
Burroughs or Phil Orzech delivered to the Building Department on or about July 15, 2005,
October 4, 2005, November 15, 2005, and December 6, 2005; (iii) the revised drawings of the
addition to the detached garage, which Burroughs dropped off at the Building Department in
November of 2006; (iv) the drawings which Attorney George Covington passed out to the Board
members during his Power Point presentation on April 9, 2007, one or more of which [it is
believed] were dropped off at the Building Department, on and following April 9, 2007, by the
Village's agents and representatives.  In her note dated November 29, 2006, Village Zoning
Technician Dana Cohen called attention to this very policy and practice of having architectural
plans "disappear" whenever convenient or expedient to do so.

185.    In reaching the aforementioned understandings, it is believed that each of these
representatives was on notice of the following facts: (i) that there were no Village receipts or
time-stamps in existence for the sets of drawings which the Building Department had received
from George, as a consequence of the No-Receipt Policy; (ii) that the actual, de facto sets of

drawings delivered to the Building Department by Burroughs, Orzech, and other individuals were no longer in the Village's physical custody, but had been transferred to a storage facility located in Lake Forest, Illinois. On information and belief, the second of these circumstances – i.e., the policy or practice whereby the Village of Lake Bluff transferred the architectural drawings and plans of its residents' projects to Lake Forest for storage – made it "easier" for one or more of the Village representatives to misrepresent and perjure themselves. Where the Building Department has been left bereft of the drawings in question, it is perhaps possible for an official to be thus enabled to pretend and dissemble that such drawings do not exist.

186.     It cannot be doubted that each of these four representatives has been made aware of additional matters of record, such as (i) the inspections of the Michaels' property by Village officials on April 9, 2007; (ii)) the inspection of the property by Village attorneys on November 24, 2008; (iii) the inspection of the property by Code Supervisor Orsini in October of 2006; and (iv) the depositions taken by Village Attorney Fisk in late 2008 – which cannot be expunged from the record the way they believe the drawings can, and which unquestionably refute their claim that both the shower and the Church came as a complete surprise. With resolute stubbornness, these four representatives of the municipality have nevertheless exhibited their willingness to deny *any* matter of record, even including inspections by their own agents and employees, in furtherance of the Reimbursement Plan which has actuated their persecution of this family.

187.     **Orchestration of three separate claims.**   As of October 20, 2009, there were two pending grievances against the Michael family, with potential fines running into six figures. On July 16, 2008, the Village had filed a complaint demanding judgment on a purported Citation in the amount of $115,000.00 as a penalty having allegedly operated a Church without obtaining a zoning variance. On December 3, 2008, Code Supervisor Nellessen proceeded to impose

fourteen requirements regarding the innocuous ramp to the couple's deck [proposing such requirements after George fulfilled the original demands] – thus raising the likelihood of further action in the event Nellessen was not completely satisfied. Upon Village Administrator Irvin's issuance of the Shower Citation on October 20, 2008, *it is believed that a decision was reached, by and between Irvin, Nellessen, Letchinger, and Village Attorney Friedman, to prosecute these three grievances for the purpose of facilitating the Reimbursement Plan, thereby collecting substantial funds to reimburse the treasury*.

188. Commencing in July of 2009, and continuing to the present date, the Village's Verified Complaint for Ordinance Violations and Monetary Fines against George and Susan (the "Church Complaint"), docketed as case no. 08 CH 2706, has been heard by the Hon. Mitchell Hoffman in regard to certain factual issues, motion practice, or settlement proposals, in the course of which the Village Attorney Peter Friedman has made statements which are believed to be (a) knowingly false, and (b) directed toward the implementation of the Reimbursement Plan, including but not limited to following: (i) prior to March 22, 2007, the Village was unaware that a Church was going to open its doors at 1955 Shore Acres Drive; (ii) the Village informed Marc Geissler that it was necessary to obtain a zoning variance for the Church; (iii) the Village never received any drawings showing the proposed conversion of the residence into a Church; (iv) the Village never indicated that the Church would be permitted to open its doors without a zoning variance. Such statements by the Village Attorney are misrepresentations of material fact, which are believed to be presented for the chief and fundamental goal of maximizing the likelihood that a fine will be imposed upon the Michaels, sufficient to defray the Village's expenditures for legal fees incurred in challenging the Church's non-homestead property tax exemption.

189.    **The Second Complaint.**  On December 31, 2009, the Village filed a Complaint

For Zoning Ordinance Violations and Monetary Fines, no. 09 CH 6241 (hereinafter the "Shower

Complaint"), requesting that a fine be assessed against George and Susan of $500.00 per day for

every day that the stand-up shower, going on 80 years old, has been allowed to exist in the

detached, garage-like structure at 1955 Shore Acres Drive.  A total fine of $577.500.00 is being

sought from the couple, bespeaking the underlying motive of utilizing a set of false and

disingenuous allegations for the ulterior purpose of reimbursing a municipality for legal fees

expended in another context.  The farcical aspect of the Village's contorted attempts to turn a pre-

existing stand-up shower into a $600,000.00 windfall fades to black once it is apprehended that

Irvin and his cohorts are grimly intent on somehow bringing this off.  The Shower Complaint

alleges that the couple had "neither sought nor received any zoning relief" regarding the shower –

demonstrably false, in light of the April 17, 2007 settlement and the deposition testimony of Ryan

Waller.  Even more brazenly, the Shower Complaint retreads the asinine accusation that George

and Susan have "constructed the Bathing Facilities" located in the detached garage.

190.    Commencing in January of 2010, and continuing to the present date, the pleading

herein referred to as the Shower Complaint, no. 09 CH 6241, has been heard by the Hon. Mitchell

Hoffman in regard to factual issues, motion practice, or settlement proposals, in the course of

which the Village Attorney has made statements which are believed to be (a) knowingly false,

and (b) directed toward the implementation of the Reimbursement Plan, including but not limited

to following: (i) the only drawings of the freestanding garage which the Village has ever received

were those delivered in February of 2006 [i.e., the sole set of drawings which did not depict the

shower]; (ii) the Village has never received any drawings in which a shower facility was

displayed in the detached garage; (iii) the Village was not placed on notice, during the April 9,

2007 inspection, that there was a pre-existing shower in the detached garage; (iv) the Village was not placed on notice, during the November 24, 2008 inspection, that a pre-existing shower was found in the freestanding garage. Such statements by the Village Attorney are misrepresentations of material fact, which are believed to be presented for the chief and fundamental goal of maximizing the likelihood that a fine will be imposed upon the Michaels, sufficient to defray the Village's expenditures for legal fees incurred in challenging the Church's property tax exemption.

## FINAL DEVELOPMENTS:

191. **RETALIATION AND DEATH THREATS**. On or about December 30, 2009, the Church served the Village of Lake Bluff with notice of its intent to seek administrative review of the Hearing Officer's final order in case no. 09 PT 0063 entered on December 1, 2009.

192. During the evening of December 30, 2009, George received an unsettling phone message from an unidentified caller, stating as follows:

> **The guy with the sick wife and kids should think twice about who he's fucking with, sleep well motherfucker.**

Reviewing the message, George thought he recognized the voice as that of a Village official, disguised insufficiently to mask an intonation peculiar to said individual.

193. Unsettled by such message, George did not feel safe in requesting the assistance of the Lake Bluff police. Instead, George contacted FBI agent Richard Tipton, who expressed concern and commenced to investigate. Shortly thereafter, Agent Tipton demanded that the Village police extend a measure of protection to the family. The Village police department complied with such directive.

194. On December 31, 2009, the Village filed the pleading referred to herein as the Shower Complaint, seeking $577,500.00 in damages, premised on an ancient, pre-existing shower in a freestanding garage. It is believed that this pleading was prepared and filed as a mode of

56

retaliation for George's intention to seek administrative review of the Hearing Officer's final decision in case no. 09 PT 0063.

195.     **THE INCIDENT OF JANUARY 12, 2010.**  On or about January 12, 2010, Susan Michael sustained life-threatening injuries, on information and belief due to her mistreatment at the hands of Village official Gerald Nellessen.  This heartbreaking incident would not have taken place, had Nellessen only heeded George's oft-repeated directive to serve Village complaints and citations upon his counsel, and refrain from pernicious intrusions upon the property at 1955 Shore Acres Drive.

196.     On or about January 12, 2010, at or about 2:00 p.m., Nellessen came out to 1955 Shore Acres Drive, accompanied by two armed officers, to serve the Village's Complaint for Zoning Ordinance Violations and Monetary Fines [i.e., the "Shower Complaint"] upon the residents at 1955 Shore Acres Drive.  It is believed that Nellessen approached the property and rang the front doorbell.  It is believed that Nellessen was on the verge of heading for the back door, as was his custom and practice, when the front door opened and Dorothy, the couple's eldest daughter, peered out at the men.  It is believed that Nellessen approached Dorothy and demanded to know if Susan was at home.  It is believed that Dorothy answered such question in the negative.  It is believed that Susan could be heard coming down the hallway, moving with her walker.  It is believed that Nellessen thereupon asked loudly of Dorothy, "You always lie like that to strangers?"  It is believed that Nellessen thereupon shook his fist at the cowed, speechless girl.  It is believed that Nellessen also demanded of Susan, "Do you teach your children to lie?"

197.     It is believed that Susan tried to come between Nellessen and her daughter, while being precipitated into an autonomic crisis by the stress of the situation.  It is believed that Susan lost grip of her walker as she came to Dorothy's aid, flailing helplessly for balance.  It is believed

57

that Susan thereupon fell violently to the floor.  It is believed that Susan's hips and pelvis took the brunt of the impact, incurring disabling injuries – with far more dire consequences to follow.

198.    Upon seeing her mother fall upon the surface of the foyer, it is believed that Dorothy became hysterical.  It is believed that Nellessen tossed the complaint and summons to the floor and left the premises.  Immobilized by her injuries, Susan was admitted to University of Chicago Medical Center where she received infusions of steroids in a desperate effort to combat a sudden outbreak of brain lesions precipitated by the incident.  Susan had not had occasion to be hospitalized during the preceding five years.

199.    **DEVASTATING INJURIES.**   The precipitous fall that Susan suffered on or about January 12, 2010 – as a consequence of Nellessen's willful misconduct – caused her to incur severe injuries, with profound consequences for her future.  The fall damaged her right hip and pelvis, requiring the reconstruction of her pelvis and replacement surgery for her hip.  Such injuries are yet overshadowed by the consequences to her brain.  Immediately following the incident, Susan began to suffer an acute outbreak of brain lesions.  ***Upon examination, it was confirmed that myriads of brain lesions had spread over the surface of her brain*** – such onset occurring directly after Nellessen came to serve papers upon her.  Susan's physician Dr. Raymond P. Roos – the chairman of neurology at U. of C. Medical Center, perhaps the foremost expert on MS in the country – had never seen such an acute attack in all his years of practice.

200.    The outbreak of brain lesions, as a consequence of the confrontation with Nellessen, has compromised Susan's prospects for any measure of recovery.  Her last autonomic crisis, the latest in a series occasioned by Nellessen's misbehavior, has exacerbated her physical symptoms.  ***Her physicians believe Tysabri treatments are the one last resort, but cannot initiate this treatment unless and until the clusters of lesions disappear***.

201.    The brain lesions have also brought about the postponement of the necessary reconstructive surgery for Susan's hips and pelvis. The operations require that spinal anesthesia be administered, incurring an untenable risk of infection of any unresolved brain lesions. As a consequence, Susan remains supine and bedridden, in a continuum of unremitting pain.

202.    **INTERROGATIONS OF DOROTHY MICHAEL.** Commencing in or about February of 2010, on information and belief, *the Village has undertaken to corner, confront, and interrogate the couple's disabled daughter Dorothy as to the nature and degree of her mother's injuries*, doing so on the premises of Lake Forest High School where Dorothy is enrolled in a special program. Such measures have been undertaken by defendant KATHLEEN O'HARA ("O'Hara"), a member of the Village's Board of Trustees who is also a coordinator at the high school.

203.    Beginning in or about February of 2010, it is believed that Board member O'Hara exploited her position at Lake Forest High School to repeatedly confront and interrogate Dorothy about her mother's health, the nature of her injuries, her prospects for recovery, and any related facts which O'Hara could inveigle or browbeat out of Dorothy. It is believed that O'Hara conducted these interrogations during school hours and thereafter, in willful disregard of the clear-cut impropriety of such confrontations and the conflict of interest thus occasioned.

204.    Commencing in or about February of 2010, Dorothy began to undergo panic attacks on a regular basis, having never exhibited such symptoms previously. It is believed that these debilitating panic attacks were the consequence of being repeatedly confronted and interrogated against her will by O'Hara. It is believed that O'Hara was aware of the nexus between her interrogations and these unprecedented symptoms. It is believed that O'Hara nevertheless continued to confront and interrogate Dorothy in order to obtain information to be

59

relayed to Letchinger, Irvin and Nellessen.

205.    On May 19, 2010, the Michaels' attorney Richard S. Zachary ("Zachary") sent a letter to O'Hara by certified mail, demanding that O'Hara cease and desist from any further attempts to interrogate Dorothy.  Zachary's May 19, 2010 correspondence to O'Hara is appended hereto and incorporated herein as Exhibit 1.  It is believed that upon receiving this letter from Attorney Zachary, O'Hara reduced the frequency of these incidents while still continuing to plan and effectuate opportunities to extract information from Dorothy.

206.    As the consequence of O'Hara's interrogations, Dorothy has been caused to suffer repeated panic attacks, emotional distress, and trauma, with related consequences that have impacted upon her pursuit of happiness and self-fulfillment.  In the spring of 2010, due to the panic attacks incurred as a consequence of O'Hara's interrogations, Dorothy's counselors rescinded her eligibility for a job offer at Marshall's Department Store in a placement program, such opportunity having been a dream come true for the disabled girl.

207.    Due to the threshold permission accorded to litigants to file pleadings, the Village has been able to eke out a series of hearings in its cases in the Lake County circuit court, requesting continuance after continuance to keep George on the treadmill.  The "issue" of the handicap ramp has made its way into case no. 09 CH 6241, thus enabling all three alleged grievances [shower, Church, ramp] to be wielded simultaneously in the hope that something might pan out.  George has spent thousands of dollars trying to satisfy additional demands of the Village in the hope of thus reducing a portion of the legal expenses that have gutted his savings. It has been a vain hope.  The Village has insisted that he cap off the pre-existing shower and cover it up with tile; then insisted he tear out the tile and start over; then stamped its foot and demanded that he redo everything from scratch since every phase of the job wasn't watched by a

Village employee. New demands similarly issue regarding the ramp, exceeding the threshold of farce. George has been forced to pay $4,500.00 for new drawings, identical to those which Nellessen possessed; has applied for additional permits, merely to maintain an unresolved status quo; has been given final "checklists," only to be saddled with additional demands the moment it seemed like he was breaking free. The Village does not want these cases to end, will never consent to give closure, so long as there remains a semblance of a chance of fulfilling the Reimbursement Plan which actuated the litigation.

208. On or about May 31, 2010, the Village amended its complaint in case no. 09 CH 6241 – demanding the assessment of $750.00 per day since the contractors who performed the work [capping and retiling] which the Village demanded did not pay a fee before getting started. Given the motive behind such pleadings, it is evident that the Village will continue to amend, revise, and re-file its disingenuous petitions until George collapses from exhaustion, runs out of money, or both.

209. **Ultimate Culpability of Letchinger and Irvin.** In or about May of 2010, Village President Christine Letchinger misrepresented to George in a series of e-mails that there was simply no record of any drawings delivered to the Building Department which displayed the shower or the Church. Letchinger promulgated such falsehood in an attempt to convince George to cough up $50,000.00 to "settle" the lawsuits which the Village has utilized toward the goal of replenishing its treasury for its legal expenses incurred elsewhere. Letchinger's participation in the Reimbursement Plan has been clear from the beginning, nor will George "settle" any matters which have been brought in bad faith and for ulterior motives.

210. Village Administrator Irvin is believed to be chiefly responsible for the concatenation of Stop Work Orders, Interventions, Demand Letters, citations, and complaints

which has befouled the dream of a new life which led George and his family to the beachfront property on Shore Acres Drive. It is believed that Irvin's underlying motives are frankly discriminatory, predicated upon the perceived undesirability of an Armenian Orthodox family in a community predominantly comprised of upscale White residents descended from Anglo-Saxon immigrants of another era. It is regrettable that ethnic and religious prejudice should actuate a civil servant charged with administrating a municipality under the dictates of the Constitution.

211. When purchasing his own residence in the Village, Irvin was given a $200,000.00 second mortgage by the municipality whose affairs he helps to oversee. Having taken advantage of his position as an insider, Irvin has sought to bolt the gates of opportunity in the faces of decent and hardworking Americans who simply wanted a chance at happiness in a new community.

212. Susan is currently awaiting surgery for the injuries to her hips and pelvis incurred in the confrontation with Gerald Nellessen in January of this year. Due to the numerous brain lesions incurred as a consequence of the same incident, her prospects for even a marginal recovery have been severely compromised.

213. Dorothy still suffers from sporadic panic attacks as a consequence of Board Trustee O'Hara's interrogations. There are no prospects for another job opportunity to take the place of the one she was forced to relinquish.

214. Robert Michael continues to miss the rituals, services and devotions which were afforded by the Armenian Church of Lake Bluff, which enlivened his existence and filled him with an especial pride as a family member. No congregant experienced a greater attachment to the place of worship, nor a deeper sense of loss now that it has been closed down.

215. George has been disabused of the faith in providence which led him to the Village of Lake Bluff some six and a half years ago. With his savings depleted and his life in a shambles,

his one remaining hope is to find a buyer for the property at 1955 Shore Acres Drive which once

reminded Susan of a dream. The traumatic stress of the past three years has enveloped him like a

shadow.

## COUNT ONE
### (Deprivation of Rights - George and Susan Michael)

1-215.    The plaintiffs restate, re-allege, and adopt the preceding paragraphs.

216.    The plaintiffs GEORGE and SUSAN MICHAEL have been deprived of their

rights guaranteed by the constitution and laws of the United States by the defendants CHRISTINE

LETCHINGER, R. DREW IRVIN, GERALD NELLESSEN, PETER FRIEDMAN and the

VILLAGE OF LAKE BLUFF, jointly and severally, acting under color of state and municipal

law and in furtherance of a manifold scheme and conspiracy to (i) close down a place of worship,

and deprive its congregants of their right to utilize its services; (ii) unlawfully reverse the issuance

of a non-homestead property tax exemption issued to a  Church, (iii) saddle the plaintiffs with

unfounded and disingenuous fines, sanctions, Stop Work Orders, Demand Letters and complaints,

as well as with the burden of paying the expenses for their defense; and (iv) to ultimately oust a

family of decent and law-abiding citizens from a community due solely to their ethnic, racial, and

religious heritage or affiliation.  The constitutional rights of the plaintiffs, of which they have

been wrongfully deprived by the aforementioned defendants, include (i) under the First

Amendment, the freedom to worship; (ii) under the Fifth and Fourteenth Amendments, the right

not to be deprived of property without due process of law; (ii) under the Fourteenth Amendment,

the right to life, liberty and the pursuit of happiness without unauthorized interference and

deprivations by the agents and representatives of municipal government.

217.    The acts of the aforementioned defendants which deprived the plaintiffs George

and Susan Michael of their rights were sanctioned and authorized by the Village of Lake Bluff, by

and through the actions of (i) Village President Christine Letchinger; (ii) Village Administrator R. Drew Irvin; (iii) Building Code Supervisor Gerald Nellessen; and (iv) the Attorney for the Village, Peter Friedman.

218.    The acts of those defendants being sued in their official capacities involve the enforcement of policies and practices of Village of Lake Bluff, under color of municipal law, and were caused, authorized and implemented by persons with final policy-making authority for the Village, namely Village President Letchinger and Village Administrator Irvin.

219.    The plaintiffs George and Susan Michael have been deprived of their rights guaranteed by the constitution and laws of the United States by the aforementioned defendants, jointly and severally, acting in furtherance of one or more of the policies, customs and/or practices of the municipality:

(a)     The policy and practice of requiring at least one set of blueprints, plans or drawings to be delivered to the Village's Building Department as a condition precedent for Village approval of any project;

(b)     The policy and practice of forbidding and barring the issuance of a receipt for any blueprints, plans or drawings submitted to the Village Building Department;

(c)     The policy and practice of transferring any and all blueprints, plans and drawings submitted to the Village Building Department to a storage facility located in Lake Forest, Illinois;

(d)     The policy and practice of issuing, enforcing, or refusing to enforce citations, warnings, stop work orders, complaints, and sanctions for purported violations of laws and ordinances;

(e)     The policy and practice of determining appropriate fines for alleged violations of laws, ordinances and regulations;

(f)     The policy and practice of conducting inspections of buildings for purported conformity with local building codes;

(g)     The policy and practice of permitting variances and exceptions to local building codes and municipal ordinances;

(h)     The policy and practice of restoring the bluff following work in the vicinity;

(i)     The policy and practice of intervening in tax proceedings before the Lake County Board of Review and Illinois Department of Revenue;

(j)     The policy and practice of utilizing Village police and fire vehicles for appropriate surveillance and related objectives;

(k)     The policy and practice of permitting Shore Acres Country Club to exercise hegemony over adjoining residences;

(l)     The policy and practice of serving Village citations, complaints, and other papers upon Village residents.

220.    As the foregoing factual allegations make clear, the defendants Letchinger, Irvin, Nellessen and Friedman, jointly and severally, have utilized and exploited one or more of the above-listed policies and practices to achieve and fulfill improper, illegal or unauthorized goals and objectives, including (i) closing down a place of worship, due to the undesirable nature of its religious affiliation and racial/ethnic heritage of its congregants; (ii) reversing the issuance of a non-homestead property tax exemption, by and through ex parte communications and behind-the-scene agreements; (iii) selectively enforcing Code provisions and zoning regulations; (iv) imposing excessive and ex post facto fines, with scant regard for due process or the facts of

record; (v) disrupting, confronting, harassing, sanctioning, and hassling a law-abiding family of undesirable religious affiliation and racial or ethnic heritage, to force the family to leave the community; (vi) permitting, condoning and encouraging the selective and disparate penalizing of said family by the Shore Acres Country Club; (vii) utilizing and exploiting purported fines, sanctions, and lawsuits issued against said plaintiffs as a means to reimburse the Village for its legal fees expended elsewhere.

221.     The aforementioned acts and omissions of the aforementioned defendants were thus in violation of 42 U.S.C. § 1983, and warrant appropriate relief thereunder.

222.     As the consequence of one or more of the aforementioned exploitations and abuses of official policies and practices by the defendants Letchinger, Irvin, Nellessen, Friedman, and the Village of Lake Bluff, the plaintiffs George and Susan Michael have been deprived of their funds and property without due process of law; deprived of their freedom to worship and to pursue their happiness in a lawful manner in a community of their choosing; confronted, hassled and harried continuously and without basis or necessity, despite suffering from medical conditions of which the defendants were aware; and otherwise persecuted, assaulted, injured and victimized without cause and for ulterior and improper motives and objectives.

223.     The deprivation of plaintiffs' rights by the defendants Letchinger, Irvin, Nellessen, and Friedman has been willful, knowing, and capricious.  An award of punitive damages is warranted against said defendants, of appropriate and exemplary extent.

WHEREFORE, the plaintiffs GEORGE MICHAEL and SUSAN MICHAEL demand the following relief against defendants CHRISTINE LETCHINGER, R. DREW IRVIN, GERALD NELLESSEN, PETER FRIEDMAN and the VILLAGE OF LAKE BLUFF:

A.     For an award of their tangible non-medical costs, expenses, and losses in a sum in excess of FIFTY THOUSAND DOLLARS ($50,000.00);

B.     For an award of their tangible medical costs and expenses in a sum in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00);

C.     For an award for SUSAN MICHAEL's pain and suffering, loss of normal life, necessity for further care and treatment, and permanence of injury in a sum in excess of FIVE MILLION DOLLARS ($5,000,000.00);

D.     For an award for the deprivation of their freedom to worship in a sum in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00);

E.     For an award for the deprivation of the constitutional rights of the Armenian Church of Lake Bluff in a sum in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00);

F.     For an award of punitive damages against the individual named defendants;

G.     For the award of their attorneys' fees;

H.     For the costs of this action;

I.     For such other relief as this Court deems appropriate.

## COUNT TWO
### (Deprivation of Rights - George and Susan Michael)

1-223.   The plaintiffs restate, re-allege, and adopt the preceding paragraphs.

224.   The plaintiffs GEORGE and SUSAN MICHAEL have been deprived of their rights guaranteed by the constitution and laws of the United States by the defendants SUSAN GARRETT and BRIAN HAMER, jointly and severally, acting under color of state law and in furtherance of a manifold scheme and conspiracy to (i) close down a place of worship, and deprive its congregants of their right to utilize its services; and (ii) unlawfully reverse the issuance

of a non-homestead property tax exemption issued to a Church. The constitutional rights of the plaintiffs, of which they were wrongfully deprived by the aforementioned defendants, include their freedom to worship and to pursue happiness without unauthorized interference and deprivations by the agents and representatives of State government.

225.     The acts of the aforementioned defendants which deprived the plaintiffs George and Susan Michael of their rights were sanctioned and authorized by the State of Illinois, by and through the actions of (i) the Director of the Illinois Department of Revenue Brian Hamer, and (ii) Illinois State Senator Susan Garrett.

226.     The acts of those defendants being sued in their official capacities involve the enforcement of policies and practices of the State of Illinois, under color of state law, and were caused, authorized and implemented by persons with final policy-making authority for the Department of Revenue, namely its Director Brian Hamer.

227.     The plaintiffs George and Susan Michael have been deprived of their rights guaranteed by the constitution and laws of the United States by the aforementioned defendants, jointly and severally, acting in furtherance of one or more of the following policies and practices by agents and representatives of State government:

(a)     The policy and practice of issuing non-homestead property tax exemptions to religious institutions;

(b)     The policy and practice of lobbying for changes or reversals of decisions by State agencies;

(c)     The policy and practice of permitting parties to intervene in opposition to the issuance of tax exemptions;

(d)     The policy and practice of issuing summary judgments and dismissal orders.

228.     As the foregoing factual allegations make clear, the defendants Susan Garrett and Brian Hamer, jointly and severally, have utilized and exploited one or more of the above-listed policies and practices to achieve and fulfill improper, illegal or unauthorized goals and objectives, including (i) closing down a place of worship, due to the undesirable nature of its religious affiliation and racial/ethnic heritage of its congregants; (ii) attempting to sway and influence a representative of Illinois government to act in an unlawful manner by and through ex parte communications and willful misinformation; (iii) reversing the issuance of a non-homestead property tax exemption, without considering any new evidence, for ulterior and improper reasons; (iv) pretending and misrepresenting that a written decision was prepared on or about July 6, 2009; (v) pretending and misrepresenting that cases 08 PT 0024 and 09 PT 0063 had been dismissed for reasons other than Director Hamer's unprecedented and unfounded decision to reverse his own issuance of a property tax exemption to the Church, doing so without basis and for ulterior reasons.

229.     The aforementioned acts and omissions of the defendants Garrett and Hamer were thus in violation of 42 U.S.C. § 1983, and warrant appropriate relief thereunder.

230.     As the consequence of one or more of the aforementioned exploitations and abuses of official policies and practices by the defendants Susan Garrett and Brian Hamer, the plaintiffs George and Susan Michael have been deprived of their freedom to worship and to pursue their happiness in a lawful manner in a community of their choosing.

231.     The deprivation of plaintiffs' rights by the defendants Brian Hamer and Susan Garrett has been willful, knowing, and capricious.  An award of punitive damages is warranted against said defendants, of appropriate and exemplary extent.

WHEREFORE, the plaintiffs GEORGE MICHAEL and SUSAN MICHAEL demand the following relief against the defendants SUSAN GARRETT and BRIAN HAMER, jointly and severally:

A.      For an award of damages for the deprivation of their freedom to worship in a sum in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00);

B.      For an award of punitive damages;

C.      For the award of their attorneys' fees;

D.      For the costs of this action;

E.      For such other relief as this Court deems appropriate.

### COUNT THREE
### (Deprivation of Rights – Robert C. Michael)

1-231.    The plaintiffs restate, re-allege, and adopt the preceding paragraphs.

232.    The plaintiff ROBERT C. MICHAEL has been deprived of his rights guaranteed by the constitution and laws of the United States by the defendants SUSAN GARRETT and BRIAN HAMER, jointly and severally, acting under color of state law and in furtherance of a manifold scheme and conspiracy to (i) close down a place of worship, and deprive its congregants of their right to utilize its services; and (ii) unlawfully reverse the issuance of a non-homestead property tax exemption issued to a Church.  The constitutional rights of the aforesaid plaintiff, of which he was wrongfully deprived by the aforementioned defendants, include his freedom to worship and to pursue happiness without unauthorized interference and deprivations by the agents and representatives of State government.

233.    The acts of the aforementioned defendants which deprived the plaintiff Robert C. Michael of his rights were sanctioned and authorized by the Village of Lake Bluff and State of Illinois, by and through the actions of (i) Village of Lake Bluff President Christine Letchinger; (ii)

Village Administrator R. Drew Irvin; (iii) the Director of the Illinois Department of Revenue Brian Hamer, and (iv) Illinois State Senator Susan Garrett.

234. The acts of those defendants being sued in their official capacities involve the enforcement of policies and practices of the State of Illinois, under color of state law, and were caused, authorized and implemented by persons with final policy-making authority for the Department of Revenue, namely its Director Brian Hamer.

235. The plaintiff Robert C. Michael has been deprived of his rights guaranteed by the constitution and laws of the United States by the aforementioned defendants, jointly and severally, acting in furtherance of one or more of the following policies and practices by agents and representatives of State government:

(a) The policy and practice of issuing non-homestead property tax exemptions to religious institutions;

(b) The policy and practice of lobbying for changes or reversals of decisions by State agencies;

(c) The policy and practice of permitting parties to intervene in opposition to the issuance of tax exemptions;

(d) The policy and practice of issuing summary judgments and dismissal orders.

236. As the foregoing factual allegations make clear, the defendants Susan Garrett and Brian Hamer, jointly and severally, have utilized and exploited one or more of the above-listed policies and practices to achieve and fulfill improper, illegal or unauthorized goals and objectives, including (i) closing down a place of worship, due to the undesirable nature of its religious affiliation and racial/ethnic heritage of its congregants; (ii) attempting to sway and influence a representative of Illinois government to act in an unlawful manner by and through ex parte

71

communications and willful misinformation; (iii) reversing the issuance of a non-homestead property tax exemption, without considering any new evidence, for ulterior and improper reasons; (iv) pretending and misrepresenting that a written decision was prepared on or about July 6, 2009; (v) pretending and misrepresenting that cases 08 PT 0024 and 09 PT 0063 had been dismissed for reasons other than Director Hamer's unprecedented and unfounded decision to reverse his own issuance of a property tax exemption to the Church, doing so without basis and for ulterior reasons.

237.    The aforementioned acts and omissions of the defendants Garrett and Hamer were thus in violation of 42 U.S.C. § 1983, and warrant appropriate relief thereunder.

238.    As the consequence of one or more of the aforementioned exploitations and abuses of official policies and practices by defendants Susan Garrett and Brian Hamer, the plaintiff Robert C. Michael has been deprived of his freedom to worship and to pursue his happiness in a lawful manner in a community of his choosing.

239.    The deprivation of plaintiff Robert C. Michael's rights by the aforementioned defendants has been done willfully, knowingly, and capriciously.  An award of punitive damages is warranted against said defendants, of appropriate and exemplary extent.

WHEREFORE, the plaintiff ROBERT C. MICHAEL demands the following relief against defendants CHRISTINE LETCHINGER, R. DREW IRVIN, PETER FRIEDMAN, SUSAN GARRETT and BRIAN HAMER, jointly and severally:

A.    For an award of damages for the deprivation of his freedom to worship in a sum in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00);

B.    For an award of punitive damages;

C.    For the award of his attorneys' fees;

72

D.     For the costs of this action;

E.     For such other relief as this Court deems appropriate.

## COUNT FOUR
### (Intentional Infliction of Emotional Distress by Gerald Nellessen – Susan Michael)

1-239.   The plaintiffs restate, re-allege, and adopt the preceding paragraphs.

240.     On or about June 24, 2008, July 20, 2008, September 25, 2008, and January 12, 2009, the defendant GERALD NELLESSEN intentionally inflicted severe emotional and physical distress upon plaintiff SUSAN MICHAEL in the course of serving Village citations or complaints upon her.

241.     On each of the aforementioned occasions, the defendant Nellessen engaged in conduct that was extreme and outrageous, inclusive of scheduling his intrusions upon the premises at times when Susan was most likely to be alone; willfully approaching the rear of the property where he was likely to spot her through a sliding glass door; pounding repeatedly and implacably upon the glass, while watching her struggling painfully on her walker to reach the door; bringing along armed and aggressive police officers; shouting intimidating insults at Susan and/or her disabled daughter Dorothy; and related misconduct.

242.     Moreover, on each of the aforementioned occasions, the defendant Nellessen willfully flouted and disregarded George's directive and authorization that Village citations and complaints be served upon his counsel Margaret Borcia, due to the severe autonomic symptoms which such confrontations caused for his ailing wife.  There was no need to visit the property to serve papers so much as once – let alone to do so repeatedly, while being well aware of the devastating impact of such confrontations upon Susan's declining health.

243.     In the course of so harassing Susan, the defendant Nellessen intended to inflict severe emotional distress, or knew that there was a high probability that his actions would cause

severe emotional distress.

244. As a direct and proximate consequence of defendant Nellessen's repeated intrusions upon the property and intentional infliction of emotional and physical distress upon Susan, the latter plaintiff has suffered severe and permanent injuries requiring her to be hospitalized and undergo related care and treatment. The emotional and physical injuries directly related and traceable to Nellessen's aforementioned acts include (i) repeated autonomic crises; (ii) severe exacerbation of MS symptoms; (iii) severe and permanent injuries to her hips and pelvis; (iv) a severe outbreak of brain lesions; (v) distress, anguish, and trauma.

245. Defendant's Nellessen's intentional infliction of emotional distress upon Susan Michael was so severe that no reasonable person could be expected to endure it.

246. In so inflicting emotional and physical distress upon Susan, defendant Nellessen acted in a willful, intentional and unconscionable manner. An award of punitive damages is warranted, of appropriate and exemplary extent.

WHEREFORE, the plaintiff SUSAN MICHAEL demands entry of judgment in her favor and against defendant GERALD NELLESSEN, as follows:

A. For an award for SUSAN MICHAEL's pain and suffering, loss of normal life, necessity for further care and treatment, and permanence of injury in a sum in excess of FIVE MILLION DOLLARS ($5,000,000.00);

B. For an award of punitive damages;

C. For the costs of this action;

D. For such other relief as this Court deems appropriate.

## COUNT FIVE
### (Intentional Infliction of Emotional Distress by Kathleen O'Hara – Dorothy Michael)

1-246. The plaintiffs restate, re-allege, and adopt the preceding paragraphs.

74

247.     Beginning in or about February of 2010, defendant KATHLEEN O'HARA intentionally inflicted emotional distress upon plaintiff DOROTHY MICHAEL in the course of interrogating her on numerous occasions at Lake Forest High School in Lake Forest, Illinois.

248.     On each of the aforementioned occasions, defendant O'Hara engaged in conduct that was extreme and outrageous, and which amounted to a manifest conflict of interest and abuse of her position as a coordinator at Dorothy's school.

249.     The defendant O'Hara was well aware that Dorothy was disabled with symptoms of MS and was suffering from a mental handicap.  Nevertheless, O'Hara willfully took advantage of such circumstances to repeatedly corner and interrogate Dorothy about the condition of her mother, utilizing the manifest impact upon Dorothy's emotions and psyche as a lever to extract information to relay to Letchinger and Irvin.

250.     In the course of so interrogating Dorothy, O'Hara was aware that there was a high probability that her actions would cause severe emotional distress, and indeed utilized such fact as a means to pry facts from the terrified girl.

251.     As a  direct and proximate consequence of the defendant O'Hara's repeated interrogations of Dorothy Michael and intentional infliction of emotional and physical distress upon her, the latter plaintiff has suffered severe emotional and psychological injuries including undergoing repeated panic attacks, distress, anguish, and trauma.

252.     Defendant O'Hara's intentional infliction of emotional distress upon Dorothy was so severe that no reasonable person could be expected to endure it.

253.     In so inflicting emotional and physical distress upon Dorothy, defendant O'Hara acted in a willful, intentional and unconscionable manner.  An award of punitive damages is warranted, of appropriate and exemplary extent.

75

WHEREFORE, the plaintiff DOROTHY MICHAEL demands entry of judgment in her favor and against defendant KATHLEEN O'HARA, as follows:

A.     For an award of her damages in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00);

B.     For an award of punitive damages;

C.     For the costs of this action;

D.     For such other relief as this Court deems appropriate.

Respectfully submitted,

/s/**Richard S. Zachary**
Richard S. Zachary P.C.
Attorneys for plaintiffs
180 North LaSalle, Suite 1925
Chicago, Illinois 60601
(312) 795-9003
Bar No. 6197914