UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE S. MICHAEL, SUSAN MICHAEL, DOROTHY MICHAEL, and ROBERT C. MICHAEL, | ) ) ) | |
| Plaintiffs, | ) ) | 10 C 3897 |
| vs. | ) ) | Judge Feinerman |
| CHRISTINE LETCHINGER, R. DREW IRVIN, GERALD NELLESSEN, PETER FRIEDMAN, KATHLEEN O'HARA, BRIAN HAMER, SUSAN GARRETT, and the VILLAGE OF LAKE BLUFF, a municipality, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs George, Susan, Dorothy, and Robert Michael filed this action under 42 U.S.C.

§ 1983, alleging that Defendants—the Village of Lake Bluff, several village officials, a state

senator, and the Director of the Illinois Department of Revenue—committed state law torts and

violated their rights under the United States Constitution. Defendants have filed four motions to

dismiss, which are granted in part and denied in part.

### Background

The facts alleged in the complaint, which spans 76 pages and 253 paragraphs, are

assumed true on a Rule 12(b)(6) motion. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759,

763 (7th Cir. 2010). Also pertinent at the Rule 12(b)(6) stage are documents "referred to in [the]

complaint" that are attached to the motions to dismiss and central to Plaintiffs' claims. *Wright v.

Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). Any variance between the

complaint's allegations and an exhibit is resolved in the exhibit's favor. *See Forrest v. Universal*

*Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). Orders entered and filings made in other courts are properly subject to judicial notice. *See United States v. Stevens,* 500 F.3d 625, 628 n.4 (7th Cir. 2007).

Plaintiffs are George Michael and Susan Michael, a married couple; their daughter, Dorothy Michael; and Robert Michael, George's brother. The Michaels will be referred to by their first names. Defendants are the Village of Lake Bluff; Christine Letchinger, the Village President; R. Drew Irvin, the Village Building Commissioner; Peter Friedman, the Village Attorney; Gerald Nellessen, the Village Building Code Supervisor; Kathleen O'Hara, a Village Trustee and also a coordinator at Lake Forest High School, which Dorothy attended; Brian Hamer, the Director of the Illinois Department of Revenue; and Susan Garrett, the state senator whose district encompasses the Village.

### A.     The Home, the Church, and the Property Tax Exemption

George and Susan purchased a lakeside home with a private beach in Lake Bluff, Illinois, in October 2003. Susan suffers from multiple sclerosis and autonomic dysfunction—a condition that causes her blood pressure to drop when subjected to stress—and had been encouraged by her physician to live near the water. Lake Bluff had the additional benefit of offering Dorothy, who is mentally disabled and shows signs of early-stage multiple sclerosis, access to schools with specialized facilities and curricula. George, Susan and Dorothy, as well as Robert, who at all relevant times resided in Chicago, are of Armenian descent and adhere to the Armenian Orthodox faith.

In October 2003, when the Michaels acquired the home, the property taxes were $27,000 per year. Before moving in, the Michaels built a pool, a rehabilitation room, a racquetball court, and two additional bedrooms. The property was reassessed in 2004, resulting in an increase in

the Michaels' property taxes to $87,000 per year, among the highest in Lake Bluff.  Soon thereafter, the Michaels decided to convert their racquetball court into an Armenian Orthodox church.  According to the complaint, the travel required to attend the Armenian Orthodox church on the far west side of Chicago was compromising Susan's health.

To give Susan's "foreshortened days as much grace" as possible, the complaint alleges, the family hired an architect, Harry Burroughs, and a contractor, Philip Orzech, to begin work on the project.  Doc. 1 at ¶¶ 30-31.  In September 2004, Burroughs submitted drawings of a proposed chapel, cathedral room, and pastor's study to the Village in an effort to determine if a zoning variance was necessary.  Pursuant to a Village policy, Burroughs was not given a receipt for delivery of the drawings.  Four sets of revised plans were delivered to the Village at various points in 2005 but, as with the first submission, no receipts were provided.  Burroughs was told by a Village official that if a zoning variance was required, the Michaels would receive notice. When the family did not hear from the Village by January 2007, they began work on the chapel. George enrolled in an online program with the Church of Spiritual Humanism, *see* http://www.spiritualhumanism.org, paid a modest fee, and obtained a clergy license.

On March 22, 2007, after the chapel's construction was complete, the Michaels conveyed their home by quit-claim deem, without charge, to the Armenian Church of Lake Bluff ("Church"), an incorporated entity created by George and Susan.  The Michaels continued to live in the home, and opened the Church to "public" services presided over by George.  On April 10, 2007, the Michaels sought a property tax exemption from the Lake County Assessor's Office; the application averred that the home was utilized primarily as a place of worship and, because the Michael children read their bibles and study books every day, a place of religious instruction.

On June 26, 2007, the Church's Treasurer, Marc Geissler, notified the Village that the Church had obtained ownership of the property and was applying for a Non-Homestead Property Tax Exemption. Irvin (the Village Administrator) wrote a letter to the Lake County Review Board on the Village's behalf opposing the exemption. Irvin and Nellessen (the Building Code Supervisor) then engaged in ex parte communications with the Board to oppose the exemption, at least in part because of the Michaels' Armenian Orthodox faith. On February 29, 2008, the Lake County Review Board denied the exemption. On March 13, 2008, the Church filed a petition with the Illinois Department of Revenue seeking further review. On June 12, 2008, Hamer (the Department's Director) issued the Church a tax exemption. Doc. 58 at 3.

The individual village defendants then began a campaign to drive the Church out of existence and to reverse the exemption. On June 20, 2008, Irvin contacted Senator Garrett, whose district encompasses Lake Bluff, asking for help in reversing the exemption. Irvin also instructed the Village police to conduct surveillance of the Michaels' home to determine if religious services actually were being conducted. On Sundays, police cars and fire trucks (with sirens on) would drive up the Michaels' driveway.

In addition, the Village issued a Notice of Zoning Violation to the Michaels for operating a church in an area zoned for residential use. Nellessen and a Village police officer delivered the Notice to the Michael home. "It is believed," the complaint says, that Nellessen went to the back of the home, pounded on a sliding glass door, scowled at Susan, declared that she and her husband were in trouble, and mentioned that Susan's body language was indicative of culpability. Doc. 1 at ¶ 109. The Notice declared that a fine as high as $250 per day could be imposed for the non-zoned use, for a total of $115,000. When George saw the Notice, he sent the Village a letter declaring that all "public" services at the Church would cease.

In July 2008, the Village filed suit against the Church, George, and Susan in the Circuit Court of Lake County, seeking fines for the Church-related zoning violations. *See Village of Lake Bluff v. Armenian Church of Lake Bluff*, 08 CH 2706 (Doc. 30-5 at 31-54). On July 20, 2008, Nellessen delivered a copy of the complaint by, "it is believed," arriving at the home when he knew Susan would be alone, walking to the back of the house, banging on a glass door, yelling at her for taking too long to open the door, and threatening to take the family's furniture if they did not pay $115,000. Doc.1 at ¶ 127. Susan experienced an autonomic crisis shortly thereafter and was forced to take medication. George then authorized his attorney to accept any Village notifications or citations.

In the meantime, on June 25, 2008, the Village and the Lake Bluff Elementary School District 65, motivated in part by the Michaels' Armenian Orthodox faith, filed with the Department an administrative appeal of the tax exemption Hamer had issued two weeks earlier. An administrative law judge ("ALJ") was assigned, and Senator Garrett commenced her efforts to get the exemption reversed, providing Hamer with ex parte "misinformation" about the Church and the Michaels. Doc.1 at ¶ 105. Director Hamer relied on Senator Garrett's statements and colluded with the ALJ to ensure that the exemption was reversed. On March 20, 2009, Director Hamer decided to reverse the tax exemption and told Friedman (the Village Attorney), through an ex parte communication, to file a motion for summary judgment before the ALJ. Summary judgment motions were filed in March 2009.

On April 21, 2009, Director Hamer issued a "Denial of Non-Homestead Property Tax Exemption," which stated that he had reconsidered the exemption because the property was not actually in exempt ownership or exempt use. Doc. 58 at 5. On July 6, 2009, the ALJ granted summary judgment to the Village on its administrative appeal of the original exemption. Doc.

30-2 at 2-30. Two days later, on July 8, 2009, Director Hamer issued a formal Notice of Decision adopting the ALJ's decision. Doc. 30-2 at 36-37. According to the complaint, Director Hamer instructed the ALJ how to rule, and the ALJ's decision, though dated July 6, was written after Director Hamer's July 8 Notice of Decision and then backdated. In the meantime, the church filed an administrative appeal of Hamer's April 21, 2009, reversal of the original exemption; the ALJ and then Director Hamer denied the appeal on res judicata grounds in light of the July 2009 decision on the Village's appeal. Doc. 20-3 at 42-48.

The Church (though not the Michaels personally) then filed administrative review actions in the Circuit Court of Cook County to challenge the Department's decision. *See Armenian Church of Lake Bluff v. Dep't of Revenue*, Nos. 09 CH 26405, 10 L 50003. The circuit court rejected the Church's challenges. The Church appealed, and the Appellate Court of Illinois affirmed. *See Armenian Church of Lake Bluff*, 2011 IL App. (1st) 102249, __ N.E.2d __, 2011 WL 3186391 (July 22, 2011). The appellate court's opinion sets forth an extensive summary of the relevant facts. 2011 WL 3186391, at *2-8. The court ruled that the Department's denial of an exemption was not against the manifest weight of the evidence. *Id*. at *8-9. In particular, the court concluded that "the record indicates the property was primarily used as a private residence for George Michael, his wife Susan Michael, and their three daughters, which is a secular use," and that "even if George Michael did conduct religious services within the single-family dwelling, these services were essentially for his wife and perhaps their children and a few close family members and friends." *Id*. at *9. The court sharply noted that key averments in the Church's exemption application—that "the former or current leader of St. Gregory [the Armenian Orthodox church on Chicago's far west side] performed a religious ritual establishing the subject property as an Armenian Orthodox church within the Easter Diocese of the Armenian

Church of North America, were conducting weekly or holiday Armenian Orthodox services on the subject property, and were residing there in an Armenian Orthodox 'parsonage'"—were "false or misleading and improperly bolstered the claimed entitlement to a religious-use exemption." *Ibid*. The appellate court also held that the Department's decisions were not based on an analysis of religious doctrine, and that due process was not violated when Director Hamer issued the "Denial of Non-Homestead Property Tax Exemption" in the midst of summary judgment briefing on the Department's administrative appeal of Director Hamer's initial April 2009 decision granting the exemption. *Id*. at *9-10.

### B. Building Code Issues and Further Litigation

The Church was not the only source of friction between the Michaels and the Village. After moving into their home in late 2004, the Michaels built a stairway from their home to the beach, a large deck on the beach, and an electric tram capable of transporting Susan down the bluff. In February 2006, George applied for a permit for an extension to the detached garage—which had been on the property for 75 years, and which already had a shower and kitchenette—but later withdrew the application because of the Village's onerous permitting requirements. When a tree fell on the garage later that year, the family proceeded with the extension without first obtaining a permit. The extension, completed in July 2006 and leaving untouched the shower and kitchenette, violated the Village Code's setback requirements. George ultimately paid two fines, totaling several thousand dollars, to resolve the violations.

In September 2008, the Michaels added a ramp to their beach deck, which allowed Susan to reach the deck in her wheelchair. On September 25, 2008, the day the project was completed, Nellessen delivered a stop work order to the Michael home. "It is believed," says the complaint, that Nellessen banged on the back door and threatened Susan with jail time, causing her to suffer

autonomic symptoms. Doc. 1 at ¶ 163. When George contacted the Village about the ramp, he was told it could not be used until he applied for a permit, submitted four sets of drawings, and satisfied fifteen additional requirements. George did not comply, but did not hear about the ramp again until the issue reemerged in state court litigation over a year later.

The additional state court litigation arose as follows. After the Department issued its final ruling denying the property tax exemption, Nellessen, Irwin, Letchinger (the Village President), and Friedman agreed to attempt to recover the Village's litigation costs by pursuing pending fines and instituting new actions against the Michaels. As part of the scheme, the village officials agreed to deny the fact that the Michaels had submitted several architectural drawings to the Village. On October 20, 2009, Irvin prepared a Notice of Zoning Violation, which concerned the shower and living quarters in the garage. The Notice indicated that the Michaels could face fines up to $500 per day, for a total penalty of $577,500, if the structure was not brought into compliance with zoning regulations.

In late 2009, the Village filed another suit against the Church, George, and Susan in the Circuit Court of Lake County, seeking payment of fines due to the shower in the Michaels' detached garage and other Building Code violations. *See Village of Lake Bluff v. Armenian Church of Lake Bluff*, 09 CH 6241 (Docs. 30-3 & 30-4). This lawsuit has since been consolidated with the 2008 lawsuit regarding the Church-related zoning violations and an earlier 2009 lawsuit, *Village of Lake Bluff v. Armenian Church of Lake Bluff*, 08 CH 9302 (described at Doc. 30 at 7). On January 12, 2010, Nellessen and two police officers served the complaint on Susan. "It is believed" that Nellessen rang the doorbell and, when Dorothy answered the door, demanded to know where Susan was. Doc.1 at ¶ 196. Dorothy lied about Susan's whereabouts and, when Susan came to the door, Nellessen shook his fist at Dorothy and loudly asked, "You

-8-

always lie like that to strangers?"  He then asked Susan, "Do you teach your children to lie?"  "It is believed" that when Susan tried to come between Nellessen and her daughter, she had an autonomic crisis, fell to the floor, and sustained injuries.  Doc.1 at ¶ 197.  Nellessen then tossed the complaint to the floor and walked away.  Susan developed brain lesions and needs reconstructive surgery on her right hip and pelvis as a result of her fall.  Doc.1 at ¶ 198-99.

C.    **Confrontation of Dorothy at Lake Forest High School**

In February 2010, O'Hara (the Village Trustee and coordinator at Lake Forest High School) confronted and interrogated Dorothy at school about her mother's health and recovery. Around that time, Dorothy began to have panic attacks and to suffer from emotional trauma. O'Hara knew she was causing Dorothy's attacks but continued to confront and interrogate Dorothy on behalf of her fellow village officials.

**Discussion**

The Michaels filed this lawsuit on June 22, 2010.  Count I alleges that Letchinger, Irvin, Nellessen, Friedman, and the Village deprived George and Susan of their First Amendment free exercise rights, their Fifth and Fourteenth Amendment due process rights, and their supposed Fourteenth Amendment right to "life, liberty and the pursuit of happiness."  Counts II and III allege that Senator Garrett, Director Hamer, Letchinger, Irvin, Nellessen, and Friedman deprived George, Susan, and Robert of their rights to free exercise and to "pursue their happiness."  Count IV alleges that Nellessen violated Illinois tort law by intentionally inflicting emotional distress on Susan.  Count V alleges that O'Hara violated Illinois tort law by intentionally inflicting emotional distress on Dorothy.  The complaint seeks at least $10.4 million in compensatory damages, as well as punitive damages, costs, and fees.  It also seeks at least $100,000 in compensatory damages and punitive damages on behalf of the Church, a non-party.

Defendants have filed four separate motions to dismiss. To survive a Rule 12(b)(6) motion, a complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (citation and internal quotation marks omitted). The court need not accept as true "abstract recitations of the elements of a cause of action or conclusory legal statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Where the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (internal quotation marks and brackets omitted).

## I. Constitutional Claims Against the Individual Defendants

Counts I, II, and III allege that the village officials (Letchinger, Irvin, Friedman, and Nellessen), Senator Garrett, and Director Hamer deprived George, Susan, and Robert of their First, Fifth, and Fourteenth Amendment rights. Irvin and Friedman are alleged to have improperly sought to persuade state and local tax officials to reverse the tax exemption granted to the Church. Irvin also is alleged to have made willful misrepresentations in zoning citations for the purpose of imposing retroactive fines on the Michaels and to interfere with their ability to practice their religion in Lake Bluff. Friedman is alleged to have made knowingly false representations in various legal proceedings and to have conspired with Irvin to curtail the Michaels' ability to worship. Letchinger is alleged to have been a part of the agreement to prosecute the Michaels, to proffer false statements to tax officials and the courts, and to seek substantial fines against them. Nellessen is alleged to have been a part of the scheme to

prosecute and fine the Michaels, to lie about the submission of drawings, and to engage in ex parte communications regarding the Church's tax exemption.  Senator Garrett is alleged to have improperly influenced the Department's consideration of the tax exemption.  And Director Hamer is alleged to have acted improperly in denying the exemption.  Defendants' various grounds for dismissal are considered in turn.

### A.    Absolute Immunity (Hamer)

The Michaels acknowledge that Director Hamer "played no direct role in the series of citations, Stop Work Orders, and legal proceedings which the village defendants allegedly utilized as a concomitant means of ousting the plaintiffs from the municipality."  Doc. 24 at 2.  Director Hamer is named as a defendant due solely to his role in the Department's ultimate denial of the Church's tax exemption.  *Id*. at 2-3.  Director Hamer enjoys absolutely immunity from those claims.

In *Heyde v. Pittenger*, 633 F.3d 512 (7th Cir. 2011), a property taxpayer brought a § 1983 damages action against members of Tazewell County Board of Review, alleging that "by setting his property's assessment at levels grossly disproportionate to its fair market value, [they] deprived him of his equal protection rights, conspired to violate his equal protection rights, and retaliated against him for previously exercising his right to challenge assessments."  *Id*. at 514.  The Board members sought dismissal on absolute immunity grounds.  The Seventh Circuit explained that the "functional approach" to absolute immunity requires courts to "look to the nature of the function performed, not the identify of the actor who performed it," and accords protection to "members of quasi-judicial adjudicatory bodies when their duties are functionally equivalent to those of a judge or prosecutor."  *Id*. at 517 (internal quotation marks omitted).  The taxpayer argued that absolute immunity did not apply because the Board members "did not

confine [their] process to materials submitted by the parties (and thus increased his property assessment on [their] own accord)." *Ibid*. The Seventh Circuit rejected that argument, holding that the Board members' actions "were quasi-judicial in nature" and that the Board's decision "within its bounds as a judicial body to revise [the taxpayer's] property assessment." *Id*. at 518. The court added that the availability of further review of the Board's decision, which Illinois law provides as a matter of right, supported the grant of immunity. *Id*. at 519.

The same result holds for Director Hamer, whose role here was to review the Lake County Board of Review's denial of the exemption—one step up the chain from the Board members in *Heyde*. The governing statute provides: "The board of review shall hear and determine the application of any person who is assessed on property claimed to be exempt from taxation. However, the decision of the board shall not be final … The clerk of the board … shall make out and forward to the Department [of Revenue] a full and complete statement of all the facts in the case. The Department shall determine whether the property is legally liable to taxation." 35 ILCS 200/16-70. As shown by the record in this case, the Department's decisions are issued by the Director. Doc. 30-2 at 36-37; Doc. 58 at 3, 5; *see* 86 Ill. Admin. Code § 200.165. The Director's decisions, in turn, are subject to judicial review, as this case illustrates. *See* 35 ILCS 200/16-70 ("The decision of the Department is subject to review under [35 ILCS 200/8-35 and 8-40].").  For the reasons articulated in *Heyde*, Director Hamer is entitled to quasi-judicial absolute immunity.

The Michaels' briefs devote one sentence to absolute immunity:  "Hamer's actions under color of state law in reversing a tax exemption as a consequence of behind-the-scene communication were not the type of actions ordinarily performed by directors of State Departments of Revenue." Doc. 24 at 6. This is akin to the taxpayer's argument in *Heyde*,

rejected by the Seventh Circuit, that absolute immunity did not apply because the Board members considered materials not submitted by the parties. 633 F.3d at 517. And for purposes of absolute immunity, it makes no difference that Director Hamer is alleged to have engaged in improper ex parte communications with Senator Garrett for the malicious purpose of depriving the Church of a tax exemption. *See Mireles v. Waco*, 502 U.S. 9, 11 (1991) ("judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial"); *Pierson v. Ray*, 386 U.S. 547, 554 (1967) ("immunity applies even when the judge is accused of acting maliciously and corruptly"); *Cooper v. Parrish*, 203 F.3d 937, 945 (6th Cir. 2000) (absolute immunity applies where, in violation of state law, state court chancellor "engaged in ex parte contact with the prosecutors and gave the prosecutors legal advice regarding ways that they could improve their case"); *Moore v. Brewster*, 96 F.3d 1240, 1244 (9th Cir. 1996) ("Nor is judicial immunity lost by allegations that a judge conspired with one party to rule against another party.") (superceded by statute on other grounds).

Before concluding with Director Hamer, the court notes that it asked the parties to brief whether the Tax Injunction Act, 28 U.S.C. § 1341, jurisdictionally barred the Michaels' § 1983 damage claims regarding the tax exemption. Doc. 46. Director Hamer and Senator Garrett jointly submitted a supplemental memorandum (Doc. 47) contending that those claims are barred not by the Act itself, but by related principles of comity. *See Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 116 (1981). The Michaels disagreed. Doc. 61. Although Director Hamer and Senator Garrett likely are correct, the issue need not be pursued. As the Seventh Circuit expressly held in *Heyde*, comity is "an affirmative defense" and thus not among the jurisdictional issues that must be reached before considering merits arguments like absolute

-13-

quasi-judicial immunity. 633 F.3d at 521. Because absolute immunity clearly provides Director

Hamer with a "ticket out of the case," *ibid*., the comity issue will not be resolved. So, too, with

Senator Garrett, who is being dismissed (at least for now) under the *Noerr-Pennington* doctrine.

### B.    *Younger* Abstention

Invoking the *Younger* doctrine, *see Younger v. Harris*, 401 U.S. 37 (1971), the village

officials and Senator Garrett urge this court to abstain from adjudicating the Michaels' § 1983

claims in light of the ongoing state proceedings—both the administrative review action

concerning the tax exemption, and the Lake County Circuit Court proceedings involving the

zoning and building code violations. *Younger* requires federal courts to "abstain from taking

jurisdiction over federal constitutional claims that involve or call into question ongoing state

proceedings." *Freeeats.com, Inc. v. Indiana*, 502 F.3d 590, 595 (7th Cir. 2007); *see also Forty

One News, Inc. v. Cnty. of Lake*, 491 F.3d 662, 665 (7th Cir. 2007). *Younger* abstention is

warranted where (1) state proceedings are ongoing; (2) the proceedings implicate important state

interests; and (3) the state proceeding present an adequate opportunity to raise constitutional

challenges. *Trust & Inv. Advisers, Inc. v. Hogsett*, 43 F.3d 290, 295 (7th Cir. 1994). Even if

these criteria are satisfied, *Younger* abstention is inappropriate where "(1) the state proceeding is

motivated by a desire to harass or is conducted in bad faith; (2) there is an extraordinarily

pressing need for immediate equitable relief; or (3) the challenged provision is flagrantly and

patently violative of express constitutional prohibitions." *Jacobson v. Vill. of Northbrook Mun.

Corp.*, 824 F.2d 567, 569-70 (7th Cir. 1987) (citations and internal quotation marks omitted).

The first exception applies here. One of the complaint's principal themes, set forth in

great detail, is that Defendants deployed the state proceedings to advance their goal of harassing

the Church and the Michaels and driving them out of Lake Bluff. Taking these charges as true,

as the court must at this stage of the litigation, the complaint has alleged facts sufficient to support the harassment and bad faith exception to the *Younger* doctrine. *See Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994) (*Younger* abstention rejected where plaintiff alleged history of personal conflict and *ad hominem* discipline); *Manos v. Caira*, 162 F. Supp. 2d 979, 987 (N.D. Ill. 2001) (*Younger* abstention rejected where plaintiff "alleged throughout the complaint that defendants have acted in bad faith and have conspired to harass him with vindictive bias"); *Torres v. Frias*, 68 F. Supp. 2d 935, 939-41 (N.D. Ill. 1999) (*Younger* abstention rejected where "plaintiffs present evidence which paints a convincing picture of bad faith on the part of defendants"); *Contreras v. City of Chicago*, 1994 WL 700263, at *3 (N.D. Ill. Dec. 13, 1994) (*Younger* abstention rejected where plaintiffs "allege with sufficient particularity facts supporting their charges that the defendants' actions were motivated by racial animus").

## C.      Res Judicata

The village officials and Senator Garrett contend that the circuit court's judgment affirming the Department's rejection of the tax exemption—a decision affirmed late last month by the state appellate court—precludes the Michaels from litigating their § 1983 claims in federal court. This defense pertains only to the claims concerning the tax exemption proceedings; it does not and could not speak to the claims concerning the zoning and building code proceedings. The preclusive effect of a state judgment turns on the rendering jurisdiction's law. *See Groesch v. City of Springfield*, 635 F.3d 1020, 1029 (7th Cir. 2011). "In Illinois, res judicata applies when: (1) there is a final judgment in the first suit; (2) there is identity of the causes of action (identified by a set of 'operative facts'); and (3) there is an identity of parties (directly or through privity of interest)." *Ibid*.

Defendants cannot satisfy the first element of res judicata, the existence of a final judgment, because the Church has not exhausted appellate review of the denial of the tax exemption; although the appellate court affirmed the Department's decision, the Church has thirty-five days to file a petition for leave to appeal to the Supreme Court of Illinois. *See* Ill. Sup. Ct. R. 315(b)(1). Sixteen years ago, the Seventh Circuit noted that a split in the Illinois courts left it with "no idea what the law of Illinois is on the question whether a pending appeal destroys the claim preclusive effect of a judgment." *Rogers v. Desiderio*, 58 F.3d 299, 302 (7th Cir. 1995). Since then, the state supreme court has twice made clear that a judgment is final for preclusion purposes only if "the potential for appellate review [has] been exhausted." *People v. Hopkins*, 922 N.E.2d 1042, 1050-51 (Ill. 2009) (noting that the court "has repeatedly" articulated that principle) (internal quotation marks omitted); *In re A.W.*, 896 N.E.2d 316, 321 (Ill. 2008) (quoting *Ballweg v. City of Springfield*, 499 N.E.2d 1373, 1375 (Ill. 1986)); *see also Lieberman v. Liberty Healthcare Corp.*, 948 N.E.2d 1100, 1105-06 (Ill. App. 2011).

The village officials maintain that *Hopkins* and *A.W.*, like *Ballweg*, arise in the collateral estoppel context and thus do not apply to res judicata. It is difficult to see the basis for the distinction, as the elements of res judicata, especially the finality element, are functionally identical to the elements of collateral estoppel. *Compare Groesch*, 635 F.3d at 1029 ("res judicata applies when: (1) there is a final judgment in the first suit; (2) there is identity of the causes of action (identified by a set of 'operative facts'); and (3) there is an identity of parties (directly or through privity of interest).") *with Gumma v. White*, 833 N.E.2d 834, 843 (Ill. 2005) (collateral estoppel applies if "(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party or in privity with a

party to the prior adjudication."). Accordingly, *Hopkins* and *A.W.* apply with equal force to res judicata. *See Fidelity Nat'l Title Ins. Co. of N.Y. v. Westhaven Props. Partnership*, 898 N.E.2d 1051, 1061 (Ill. App. 2007) (rejecting res judicata defense where potential for appellate review of underlying judgment not exhausted); *Pelon v. Wall*, 634 N.E.2d 385, 388 (Ill. App. 1994) (same); *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 449-50 (2d Cir. 1995) (same) (Illinois law). It bears mention that a state appellate court decision decided after *A.W.* but before *Hopkins* held that "a final judgment can serve as the basis to apply the doctrine of *res judicata* even though that judgment is being appealed." *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 909 N.E.2d 848, 863 (Ill. App. 2009). But the decision did not acknowledge, let alone distinguish, *A.W.* or *Ballweg*, and thus has no persuasive value.

Accordingly, the Department's decision denying the tax exemption is not final for preclusion purposes. Defendants may reassert their res judicata defense if and when the Church exhausts appellate review. In that event, it will be necessary to determine whether the second and third elements of res judicata are satisfied.

### D. *Noerr-Pennington* Doctrine

The village officials and Senator Garrett also invoke the *Noerr-Pennington* doctrine. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). The doctrine "has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses." *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). *Noerr-Pennington* allows individuals and entities to "petition the government for official action favorable to their interests without fear of suit, even

if the result of the petition, if granted, might harm the interests of others." *Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999).

The village officials are alleged to have solicited Senator Garrett's assistance in opposing the tax exemption. Doc. 51 at 4-5. Seeking the assistance of a legislator plainly is protected by *Noerr-Pennington*, *see Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092-93 (9th Cir. 2000), even if the lobbying is on behalf of a municipality, *see New West*, 491 F.3d at 722; *Manistee Town Ctr.*, 227 F.3d at 1093. The village officials also are alleged to have made willful misrepresentations in the exemption proceedings before the Department of Revenue and the courts. Doc. 51 at 4-5. As a general rule, the pursuit of administrative and court proceedings is protected by *Noerr-Pennington* as well. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011).

The Michaels assert that the "sham" exception to *Noerr-Pennington* applies to the extent that the village officials are alleged to have deployed misrepresentations and deceit in the administrative and judicial proceedings. Doc. 51 at 5-9. The Seventh Circuit recently clarified the scope of the sham exception as it applies to conduct in adjudicative proceedings. The court explained that there are "two specific kinds of conduct that can trigger the sham exception: (1) sham lawsuits; and (2) fraudulent misrepresentations." *Mercatus Grp.*, 641 F.3d at 842. The litigation between the Village, on the one hand, and the Church and the Michaels, on the other, does not satisfy the "sham lawsuits" component of the sham exception. A lawsuit is a sham only if it is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993). The exemption-related administrative and judicial proceedings obviously are not

objectively baseless, as the Village thus far has prevailed on the merits.  The judicial proceedings involving the building code and zoning matters also cannot be said to be objectively baseless; the complaint alleges that village officials pursued the zoning and building code litigation in bad faith and for discriminatory purposes, but the complaint's allegations do not plausibly suggest that the charges were objectively baseless.  Doc. 30-5 at 29 (order of Lake County Circuit Court denying motion to dismiss filed by the Church and the Michaels); *see IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 312 (4th Cir. 2003) (as long as litigation is not objectively baseless, it can be "deceitful, underhanded, or morally wrong" and still "not defeat immunity").

The Michaels, however, can invoke the "fraudulent misrepresentation" component of the sham exception.  As the Seventh Circuit explained, "there is little doubt that fraudulent misrepresentations may render purported petitioning activity a sham." *Mercatus Grp.*, 641 F.3d at 842.  "[A] misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." *Id*. at 843.  Under this principle, "although successful petitioning activity may not, as a general matter, be deemed a sham, the fraud exception can remove that immunity if success is achieved by means of intentional falsehoods." *Ibid*.  The complaint sets forth in detail the intentionally false representations that the village officials are alleged to have made, and plausibly suggests that those misrepresentations led to the Village's victory in the exemption-related administrative and judicial proceedings.  Doc. 1 at ¶¶ 95, 103, 105, 116-17, 122-23, 142, 144.  The complaint also details the allegedly false representations that the village officials have made in connection with the zoning and building code issues now before the Lake County Circuit Court.  Doc. 1 at ¶¶ 64, 111, 126, 184-86, 188, 190, 209, 220.  These allegations—which, while subject to serious doubt,

must be assumed true at the pleadings stage—foreclose the village officials' *Noerr-Pennington* defense as to their conduct in the administrative and judicial proceedings. The fraud component of the sham exception does not apply to non-adjudicatory activities, *see Mercatus Grp.*, 641 F.3d at 843-44, so it does not defeat the *Noerr-Pennington* defense for the village officials' alleged communications with Senator Garrett.

The Michaels' only claim against Senator Garrett alleges that she improperly contacted Director Hamer on the Village's behalf to urge him to reject the exemption. *Noerr-Pennington* protects Senator Garrett from liability on this claim. The doctrine applies to communications with state and local agency officials. *See Cal. Motor Transp.*, 404 U.S. at 510-11; *Empress LLC v. City & Cnty. of San Francisco*, 419 F.3d 1052, 1056-57 (9th Cir. 2005) (sham exception does not apply where plaintiffs alleged that defendants' conduct constituted "a wink," meaning an indication to government officials that they should rule in a particular way); *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059-60 (9th Cir. 1998). By contrast to the situation with the village officials, the fraud component of the sham exception does not apply to Senator Garrett. The reason is that the complaint alleges only that Senator Garrett passed along misinformation from village officials to Director Hamer; the complaint does not expressly allege or plausibly suggest that Senator Garrett's *intended* to pass along misinformation or *knew* that the information was false. Doc. 1 at ¶¶ 105 ("Garrett … divulg[ed]" to Hamer "numerous items of misinformation gleaned from her conversations with Irvin"), 138 ("Garrett engaged in ex parte communications with IDR Director Brian Hamer, regarding her distorted and mistaken perception that the Armenian Church of Lake Bluff was not a bona fide place of worship").

Absent those allegations, the fraud component of the sham exception does not defeat Senator Garrett's invocation of the *Noerr-Pennington* defense. *See Mercatus Grp.*, 641 F.3d at

843 ("a misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation … was intentionally made, with knowledge of its falsity").  The Michaels are given leave to attempt to re-plead their claim against Senator Garrett, assuming they can do so consistently with their and counsel's Rule 11 obligations.  If the Michaels attempt to do so, Senator Garrett may reassert her comity and other challenges.

### E.  Failure to State a Claim

#### 1.  Pursuit of Happiness

The complaint alleges at several points that the village officials deprived the Michaels of their right to "pursue their happiness in a lawful manner in a community of their choosing." Doc. 1 at ¶¶ 206-216, 222, 230, 232, 238.  Although the Declaration of Independence provides that "the pursuit of Happiness" is among the inalienable rights endowed all individuals, it is not an enforceable constitutional right.  *See Cobble v. Value City Furniture*, 2007 WL 2228156, at *4 (W.D. Ky. July 27, 2007) ("the pursuit of happiness is not a legally cognizable interest"); *Calimese v. Am. Psychiatric Ass'n*, 2003 WL 22284655, at *1 (N.D. Ill. Oct. 2, 2003) (same); *Coffey v. United States*, 939 F. Supp. 185, at 190-191 (E.D.N.Y. 1996) (same).

#### 2.  Free Exercise

The village officials contend that the complaint fails to state a free exercise claim.  They reason that the Village's enforcement of facially neutral zoning and building code provisions only incidentally affected the Michaels' religious activities by regulating the Church's location and structure.  The Michaels respond that the village officials' enforcement of the zoning and building code ordinances comprised an effort, motivated by religious animus, to close the Church and to prevent them from practicing their faith in Lake Bluff.

The governing law is clear: "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). That is precisely what the complaint alleges; the Michaels claim that the village officials enforced facially neutral zoning and building regulations in a discriminatory manner due to anti-Armenian Orthodox animus. Because the complaint sufficiently alleges that the Michaels were selectively burdened because of their religious beliefs, they have stated a claim under the Free Exercise Clause. Whether that claim has any basis in fact remains to be seen.

### 3. Due Process

The complaint alleges that the village officials violated due process, and the Michaels' brief makes clear that their due process claim sounds in substantive due process, not procedural due process. Doc. 51 at 10-12. The Supreme Court has held that where a particular "Amendment provides an explicit textual source of constitutional protection against [a particular sort of government behavior], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also United States v. Lanier,* 520 U.S. 259, 272 n.7 (1997) ("if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under [that] standard"). Here, the Michaels have forcefully alleged that the village officials' conduct were motivated by religious animus and that a specific constitutional provision, the Free Exercise Clause, protected them from the officials' wrongful conduct. It follows that the Michaels may not also seek relief under a substantive due process theory. *See Eby-Brown Co., LLC v. Wis. Dep't of Agric.*, 295 F.3d 749, 753-54 (7th Cir. 2002)

(rejecting substantive due process claim on the ground that plaintiff's "arguments [were] more properly considered claims under the equal protection clause alone"); *Allen v. Tilton*, 2009 WL 926988, at *2 (C.D. Cal. Apr. 2, 2009) (same for free exercise claim); *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d. 942, 951 n.6 (S.D. Ind. 2007) (same for equal protection claim).

## II.    *Monell* Claims Against The Village

On behalf of George and Susan, Count I purports to allege a *Monell* claim, *see Monell v. Dept. of Soc. Servs. of City of N.Y.,* 436 U.S. 658 (1978), against the Village under 42 U.S.C. § 1983. "A municipality may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability. A municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citing *Monell,* 436 U.S. at 694). Put another way, "local governments are responsible only for their *own* illegal acts" and may not be held "vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (internal quotation marks omitted). To prevail on a *Monell* claim, the plaintiff must show that a municipal employee's unconstitutional act was caused by: "(1) an express [municipal] policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citation omitted); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must prove

causation in the form of a "direct causal link between the municipal policy and the constitutional deprivation." *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 510 (7th Cir. 1993). That is, the plaintiff must demonstrate that the municipality, "through its *deliberate* conduct, … was the 'moving force' behind the injury alleged." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997); *see also Connick*, 131 S. Ct. at 1358 n.5; *Gable*, 296 F.3d at 537.

The complaint alleges that twelve Village policies caused the Michaels to suffer constitutional injury. Doc. 1 at ¶ 219. The Michaels' brief abandons any claims based on ten of the policies, focusing instead on two: (1) the "policy and practice of requiring at least one set of blueprints, plans or drawings to be delivered to the Village's Building Department as a condition precedent for Village approval of any project"; and (2) the "policy and practice of forbidding and barring the issuance of a receipt for any blueprints, plans or drawings submitted to the Village Building Department." *Id*. at ¶ 219(a)-(b); Doc. 49 at 3-4, 11-13.

"The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). To prevail on that theory, the plaintiff must "point to … language in the … policy that is constitutionally suspect." *Id*. at 381. The Michaels do not contend, and could not plausibly contend, that any constitutional suspicion could be cast on (1) a policy requiring citizens to submit blueprints, plans, or drawings prior to the approval of zoning variances and building permits or (2) a policy of not issuing receipts for those documents. Instead, the Michaels submit that those policies left them "at the mercy of an opportunistic official seeking to assess a retroactive fine for long-standing 'violations,' whi[le] denying any foreknowledge that the condition ever existed." Doc. 49 at 12; *see also* Doc. 1 at ¶ 220 (alleging that the policies were "utilized and exploited" by village officials).

Governing precedent forecloses the Michaels' theory. In *Rasche v. Vill. of Beecher*, 336 F.3d 588 (7th Cir. 2003), the *Monell* claim concerned a zoning ordinance regarding signs and an adjudicatory ordinance establishing procedures to enforce the zoning ordinance. Like the Michaels, the *Rasche* plaintiffs did not contend that either ordinance "is unconstitutional or represents unconstitutional policies." *Id*. at 599. Instead, also like the Michaels, the *Rasche* plaintiffs argued that "the ordinances, although not unconstitutional in themselves, have caused a constitutional violation" because they were enforced in an unconstitutional manner by village officials. *Ibid*. The Seventh Circuit rejected that argument, reasoning that "[i]n order for a § 1983 plaintiff 'to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights,' the plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" *Ibid*. (quoting *Bryan Cnty.*, 520 U.S. at 407). The court concluded that because the plaintiffs "d[id] not articulate how the obvious consequence of enacting the zoning ordinances was that the ordinances would be used to retaliate against [the plaintiffs'] or other citizens' exercise of their First Amendment rights," the *Monell* claim failed as a matter of law. *Ibid*.

The *Monell* claim here fails for the same reason. The Michaels do not and could not articulate how the obvious consequence of the "document submission" and "no-receipt" policies was that the policies would be used to violate their or other citizens' free exercise or due process rights. It follows that their *Monell* claims against the Village must be dismissed. *See Waters v. City of Chicago*, 580 F.3d 575, (7th Cir. 2009) ("Misbehaving employees are responsible for their own conduct; units of local government are responsible only for their policies rather than misconduct by their workers.") (citation omitted).

### III.     State Tort Claims Against Nellessen and O'Hara

On behalf of Susan and Dorothy, respectively, Counts IV and V allege intentional infliction of emotional distress against Nellessen and O'Hara, respectively.  To state such a claim under Illinois law, the plaintiff must plead: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress." *Cangemi v. Advocate S. Suburban Hosp.*, 845 N.E.2d 792, 813 (Ill. App. 2006).  The tort "does not arise from threats, insults, indignities, annoyances, or petty oppressions, but from coercion, abuse of power or authority, and harassment." *Valentino v. Hilquist*, 785 N.E.2d 891, 903 (Ill. App. 2003) (citation omitted).

The gist of Count IV is that Nellessen harassed Susan by serving her with official papers while she was home alone, threatening her with fines and jail time, yelling at her, banging on the doors, and threatening her daughter.  The gist of Count V is that O'Hara abused her position as a coordinator at Lake Forest High School by interrogating and browbeating information out of Dorothy about her mother despite knowing that Dorothy was suffering from panic attacks and mental disabilities.  Both counts are founded exclusively on facts that, if true, would necessarily be within the knowledge of Susan and Dorothy, who personally experienced the events.  But for reasons unexplained, each material allegation is pleaded through "information and belief." According to the complaint, "it is believed" that Nellessen served Susan on several occasions with complaints and citations, that Nellessen attacked her back door and yelled at her as she approached and opened it, that Nellessen threatened her, and that Nellessen caused her to fall. Doc. 1 at ¶¶ 109, 127, 163, 196-98.  Likewise, the complaint alleges that "it is believed" that O'Hara cornered and interrogated Dorothy regarding Susan's health.  *Id.* at ¶¶ 203-06.

The complaint's use of the "it is believed" device defeats Susan's and Dorothy's emotional distress claims. When filing suit, a plaintiff represents that "to the best of [her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances … the factual contentions [in the pleading] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). The Rules allow a plaintiff, when alleging matters peculiarly within the defendant's knowledge, to plead on "information and belief." *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); 5 Wright & Miller, *Federal Practice & Procedure* § 1224, at 300 & n.7 (3d ed. 2004). This pleading doctrine protects plaintiffs who cannot reasonably be expected to have personal knowledge of the matter being pled. *See id*. at 300 ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff."). However, "information and belief" pleading "is not an appropriate form of pleading if the matter is within the personal knowledge of the pleader or 'presumptively' within his knowledge, unless he rebuts that presumption." *Id*. at 300-01; *see also Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005); *Garcia v. Swire Pac. Holdings, Inc.*, 2010 WL 1524230, at *5-6 (S.D. Fla. Apr. 14, 2010) (whether a plaintiff experienced a particular event "is the type of fact, peculiarly within the Plaintiff's knowledge, that need not be developed during the discovery process"); *Davis v. Noufal*, 142 F.R.D. 258, 260 (D.D.C. 1992).

Given the alleged facts underlying their emotional distress claims and their direct participation therein, Susan and Dorothy presumptively know whether Nellessen and O'Hara, respectively, did what the complaint alleges they did. Accordingly, Counts IV and V cannot rest on allegations made on information and belief. Susan and Dorothy are given leave to attempt to

re-plead those counts based on personal knowledge, assuming they can do so consistently with their and counsel's Rule 11 obligations and the applicable statute of limitations. If Susan and Dorothy attempt to do so, Nellessen and O'Hara may reassert their other challenges to the emotional distress claims.

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss are granted in part and denied in part. The claims against the Village of Lake Bluff and Director Hamer are dismissed with prejudice. The § 1983 claim against Senator Garrett, and the state tort claims against Nellessen and O'Hara, are dismissed without prejudice and with leave to file an amended complaint by September 2, 2011. The § 1983 claims against Letchinger, Irvin, Nellessen, and Friedman are dismissed with prejudice, except for the free exercise claims. The complaint's request for damages on behalf of the Church, a non-party, is stricken.

August 5, 2011 _____
United States District Judge