IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE S. MICHAEL and SUSAN MICHAEL | ) ) ) | |
| Plaintiffs, | ) ) | 10 CV 3897 |
| v. | ) ) | Judge Feinerman |
| CHRISTINE LETCHINGER, R. DREW IRVIN, GERALD NELLESSEN and PETER FRIEDMAN, | ) ) ) | Magistrate Judge Cox |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiffs, George S. Michael and Susan Michael, for their First Amended Complaint against defendants, Christine Letchinger, R. Drew Irvin, Peter Friedman, and Gerald Nellessen, state as follows:

**The Parties**

1. Plaintiffs George S. Michael ("George") and Susan Michael ("Susan") (collectively, the "Michaels") are a married couple, residing in this district at 1955 Shore Acres Drive in Lake Bluff, Illinois (the "Property").

2. Defendant Christine Letchinger is Village President of the Village of Lake Bluff, Illinois (the "Village").

3. Defendant R. Drew Irvin is the Village Administrator of the Village.

4. Defendant Peter Friedman is the Village Attorney of the Village.

5. Defendant Gerald Nellessen is Building Code Supervisor of the Village.

**Jurisdiction and Venue**

6. This Court has subject matter jurisdiction over the civil rights claims alleged herein under 28 U.S.C. §§ 1331 and 1343. This Court has subject matter jurisdiction over the

Illinois state law claims alleged herein under 28 U.S.C. § 1367 because those claims are so related to the civil rights claims over which this Court has original jurisdiction that they form part of the same case or controversy.

7. This Court has personal jurisdiction over the defendants, and venue is proper here under 28 U.S.C. § 1391 because all of the defendants reside in this district, the events giving rise to the claims occurred in this district, and the property that is the subject of this action is situated in this district.

*The Michael Family Moves to Lake Bluff*

8. Susan suffers from multiple sclerosis, a condition with which she was first diagnosed in 2000. This condition is subject to exacerbation by stressful situations. Susan also suffers from a complication of multiple sclerosis known as "autonomic dysfunction," a condition with which was first diagnosed in 2005. This condition causes Susan's blood pressure to drop suddenly in certain situations, including situations in which she is subjected to increased stress, the result of which can be sudden cardiac death.

9. In 2003, the Michaels, who were living in the Chicago area with their three daughters, were looking to purchase a new home. Mindful of the fragility of Susan's medical condition and the need to minimize, to the extent possible, her encounters with stressful situations, the family sought to relocate to a peaceful and calming atmosphere. With that goal in mind, in October 2003, they acquired the Property, which abuts a bluff overlooking Lake Michigan.

10. The Michaels are of Armenian descent and are life-long members of the Armenian Orthodox Church. Both their ethnicity and their religion placed them distinctly in the minority amongst the Lake Bluff populace.

11. Susan's debilitating disease made it difficult for the family to continue to make the trip to Chicago to attend services at St. Gregory the Illuminator Armenian Church, where they were life-long parishioners. An additional hindrance was the fact that the church lacked handicapped accessibility.

12. Because of the importance to them of their religion and religious heritage, the Michaels explored the possibility of building a chapel within their home. Toward that end, in June 2004, they engaged an architect, Harry Burroughs, who suggested that a racquetball court that was located in the house could be suitably adapted for that use.

13. On July 27, 2004, Burroughs called Brad Burke, the Assistant Village Administrator of the Village, and inquired whether the Village would require a special use permit if religious services were conducted in the proposed chapel. Burke instructed Burroughs to submit drawings showing the planned use so that it could be determined whether a special use permit would be required. Burroughs prepared the requested drawings, which on information and belief, were tendered to the Village in 2004 and/or 2005.

14. The Michaels and their daughters moved into the Property in or about October 2004.

15. Over the next 44 months, the Michaels received no notice from the Village that the Village would require a special use permit in connection with the religious use about which Burroughs had inquired.

*Construction of Beachfront Deck*

16. The Property includes a private beach located beyond the bluff. At the time the Michaels acquired the Property, the sole means of reaching the beach was to descend the bluff using a crude and difficult-to-navigate stone stairway.

39475.7

17. In order to enable Susan to have access to the beach area, in the spring of 2005, George constructed wooden stairway, an electric tram that could carry Susan up and down the stairway, and a wooden deck at the bottom of the stairway, near the private beach. The Village required a permit for the installation of the tram, but not for the construction of the stairway or deck.

*The Pre-Existing Garage*

18. When the Michaels acquired the Property in 2003, it had a free-standing two-car garage located about 100 yards from the house. Within the garage was an area for parking cars and a separate area with a bathroom (with a toilet, a shower, and a sink) and a small kitchenette. On information and belief, the bathroom and the kitchenette were several decades old at the time the Michaels acquired the Property.

19. In the summer of 2006, a tree on the Property was struck by lightning and fell on the garage, resulting in extensive damage and leaving the interior of the structure exposed to the elements. The Michaels thereupon undertook work that both repaired the garage and resulted in the garage being enlarged by 488 square feet. That work was completed on July 6, 2006.

20. On or about October 4, 2006, the Village issued to the Michaels a notice of violation for "install[ing] an addition and remode[ling] the existing detached garage" without a permit. The fine imposed by the Village was $1,500.00, which the Michaels timely paid on October 6, 2006.

21. On or about October 12, 2006, the Village's Building Code Supervisor and Deputy Building Commissioner, Andy Orsini, inspected the garage, both exterior and interior, viewing the shower, sink, toilet, and kitchenette.

22. Because the enlargement of the garage resulted in the garage extending closer to the property line, it was in violation of the Village's requirements concerning set-back distances from property lines. Orsini instructed George to supply the Village with a survey and drawings of the work and to apply for a zoning variance for the nonconforming setback.

23. George submitted an application for the zoning variance on October 19, 2006 and an additional application on December 6, 2006. On information and belief, at or around the time George submitted those applications, the Michaels' architect, Burroughs, submitted to the Village the drawings requested by Orsini, which included depictions of the pre-existing shower in the garage.

24. On December 18, 2006, prior to advising the Michaels regarding the status of their application for a zoning variance for the nonconforming setback, the Village served the Michaels with a Notice of Ordinance Violation for still having on their Property the addition to the garage that had been constructed without a permit. The notice assessed a fine of $3,550.00, a penalty of $50.00 per day for the 71 days preceding the date of filing of the application (*i.e.*, September 27 to December 6, 2006).

25. George thereafter reached an oral agreement with Orsini to pay $3,000 in satisfaction of the December 18, 2006 Notice of Violation.

26. The Michaels' attorney, George Covington, thereupon delivered to Orsini a check payable to the Village in the amount of $3,000, which the Village deposited on or about January 23, 2007.

27. On information and belief, Village President Christine Letchinger was in timely fashion advised of Orsini's agreement to settle, George's tender of payment, and the Village's depositing of the check.

28. On or about February 9, 2007 Orsini resigned from the position of Village Code Supervisor, a position that was thereupon assumed by Gerald Nellessen.

29. On April 9, 2007 members of the Village Board of Trustees, as well as Village President Letchinger, personally viewed the freestanding garage, including the interior portion with the shower, sink, and kitchenette. Later that day the Board voted unanimously to grant the requested setback variation. At that meeting the Michaels' attorney, George Covington, made a presentation to the Board members, as well as Letchinger and Friedman, that included a large on-screen projection of Burroughs' drawings depicting the pre-existing shower in the garage.

30. On or about April 10, 2007, Covington and the Village's Building Commissioner, Kent Street, agreed to payment by the Michaels of a $7,700 fine in resolution of the pending garage issues. This fine was calculated on the basis of a $50.00 per diem penalty for 154 days (*i.e.*, from July 6, 2006 through December 6, 2006). Street told Covington that the payment would not be deposited until the permit for the setback variation was issued.

31. On April 11, 2007 Street sent Covington a letter confirming that George Michael had agreed to pay a fine of $7,700 "for violating the zoning code by constructing an addition to his garage without zoning approval." Covington countersigned the letter on April 17, 2007 and returned it to Street with the $7,700 payment. Covington's cover letter accompanying the payment memorialized that the payment satisfied "all penalties for zoning and building violations arising out of or related to the construction of the addition to the freestanding garage." The letter further stated: "As we have discussed, it is also my understanding that you will hold this check until such time as the Village has issued variations for the front yard and side yard setback violations resulting from that addition, and such variations are final. If my

understanding is incorrect or incomplete, please let me know immediately so that I can retrieve the check."

32. On or about April 18, 2007 George contacted Building Code Supervisor Gerald Nellessen and asked if he required a final inspection of the garage structure. Nellessen stated "that was on Andy [Orsini]'s watch. I had nothing to do with it." So, no final inspection was done.

*The Village's Challenge to the Property Tax Exemption*

33. In or about February 2007 the racquetball court in the Michael residence was converted to a chapel as depicted in the drawings previously prepared by Burroughs.

34. In addition to constructing the chapel, George also arranged for the incorporation of a formal church entity, which was given the name "Armenian Church of Lake Bluff" (the "Church"). The Property was conveyed to the Church on March 22, 2007.

35. On or about April 10, 2007 the Church filed an application for non-homestead property tax exemption. The Village subsequently intervened in opposition to this application. On June 12, 2008, the Illinois Department of Revenue issued a Non-homestead Property Tax Exemption Certificate over the Village's objection.

36. On June 25, 2008, the Village filed a protest of the Department's decision, and, on July 8, 2009, the Illinois Department of Revenue issued a 'Notice of Decision' reversing its issuance of the exemption. On July 31, 2009, the Church filed an administrative review action challenging the Department's decision.

37. The amount of property taxes that the Village stood to gain for the year 2007 in challenging the exemption was approximately $2,200. In the course of litigating the tax

39475.7

exemption in administrative and state court proceedings, it is believed that the Village incurred in excess of $100,000 in litigation expenses.

***The Defendants' Actions With Respect to the Church***

38. On or about June 24, 2008, two weeks after the Illinois Department of Revenue issued the tax exemption, Nellessen, accompanied by an armed police escort, served Susan with a letter from Village Administrator Irvin (who also served as Village Building Commissioner) stating that the operation of the Church was a Zoning Violation because the Property was zoned for residential use only. The letter further stated that, in December 2006, Marc Geissler (the Michaels' accountant) was "specifically informed by the Village" that the Church required "specific zoning relief and Village Board approval." On information and belief, this statement was untrue.

39. In the month of June 2008, at Irvin's direction, the Village's police department conducted surveillance of the Michael residence on Sunday mornings for the purpose of observing whether church services were being conducted inside.

40. On July 18, 2008, the Village filed in Illinois state court a Verified Complaint for Ordinance Violations and Monetary Fines against the Church, George, and Susan in Case No. 08 CH 2706. The Complaint alleged that the Church amounted to an impermissible use of the Property for which a special use permit had not been applied for or received. The Complaint demanded that a *per diem* fine of $250 be assessed beginning March 22, 2007, totaling $115,000.

***The Defendants' Response to the Michaels' Handicapped Ramp***

41. In or about September 2008, Susan acquired a walker in order to increase her mobility. In that same month the Michaels connected a handicapped ramp to the beach-front

deck that had been constructed in 2005 without the Village requiring any permits or approvals. The Michaels also expanded the deck to accommodate the handicapped ramp.

42. On or about September 25, 2008, Nellessen, the Village's Building Code Supervisor, accompanied by an armed police escort, served Susan with a Stop Work Order which recited that an addition to the deck had been constructed without submitting construction documents and without obtaining a permit.

43. On or about September 26, 2008, Nellessen advised George that, in addition to obtaining a permit he would have to obtain expert verification that the extension to the deck did not violate any applicable "wetland requirements."

44. On or about September 26, 2008, Burroughs submitted to the Village an Application for Building Permit for "expansion of existing deck at base of tram with handicapped accessible ramp for wheelchair."

45. George also engaged the firm of Hey and Associates (the same firm used by the Village in conducting wetland studies) with regard to the purported wetland issue raised by Nellessen.

46. On October 7, 2008, Irvin issued to the Church a citation in the form of a letter from Irvin for violating the September 25, 2008 stop work order. The citation was assigned Docket No. 08 OV 9302. The activity for which the citation was issued consisted of a worker *moving a gas grill and putting up a string of lights*. Neither activity required a building permit and therefore did not violate the stop work order. The letter, which purported to impose a fine of $3,900, was served on Susan at the Michael residence.

47. On November 13, 2008, Hey and Associates issued a report making clear that the addition to the deck was exempt from wetland requirements. The report indicated that such an

39475.7

alleged issue – wetland requirements relative to an extension to a deck – had never in their experience been raised previously by any municipality. That report was provided to the Village on November 19, 2008.

48. On December 3, 2008, Nellessen next issued to George a notice with fourteen demands regarding the handicapped ramp. This included a demand for compliance with Illinois accessibility requirements that have no applicability to a residence. On June 2, 2010, the number of demands was dropped to ten and then to four, which the Michaels complied with. Neither Nellessen nor anyone else from the Village came to perform a final inspection. In the end Nellessen's demands ended up costing the Michaels more than $10,000 for architectural drawings, Hey & Associates documents, surveys of ground and water draining and aerial photos.

***The Defendants' Actions With Respect to the Pre-Existing Shower***

49. On or about November 24, 2008, in connection with the administrative proceeding concerning the property tax exemption, Village Administrator Ryan Waller, Village Attorney Peter Friedman, and Friedman's associate Andrew Fiske conducted an inspection of the Michael residence and the free-standing garage. During that inspection Friedman took photographs of the pre-existing shower in garage.

50. On December 10, 2008, also in connection with that administrative proceeding, Friedman took George's deposition. During his deposition George testified as to the existence of the shower in the garage.

51. On or about October 20, 2009, Irvin issued to the Michaels and to the Church a letter notifying them of a zoning violation for maintaining a purportedly illegal living quarters in an "accessory structure" (*i.e.*, the freestanding garage). Irvin's letter quoted a section of the Village's zoning regulations:

> Living quarters shall not be permitted in an accessory building. An accessory building or structure shall be considered to have living quarters if an accessory building or structure has heat, light, and bathing or shower facilities.

The letter went on to state:

> [T]he bathing or shower facilities that have been constructed within the accessory structure are violations of Lake Bluff Building Code because they were not included on any plans that you or your contractors submitted to the Village. . . .

52. On information and belief, on several occasions drawings plainly depicting the shower had been submitted to the Village on behalf of the Michaels.

53. Prior to Irvin's October 20, 2009 letter, the last communication between George and the Village regarding the garage was the *April 18, 2007* telephone call from George to Nellessen asking if a final inspection of the garage would be needed.

54. On December 31, 2009, Village Attorney Friedman filed a Complaint in Illinois state court, Case No. 09 CH 6241, naming the Church, George, and Susan as defendants. The Complaint alleged that because the garage included a shower, it constituted living quarters, which were prohibited in "accessory structures" such as the garage, and demanded judgment for fines totaling $577,500. The Complaint falsely alleged that the defendants had "constructed the Bathing Facilities" located in the garage.

55. Friedman thereafter demanded that the water lines for the shower be capped, the shower drain cemented, and the shower doors removed. The Michaels engaged a licensed plumber to perform this work. Upon the completion of this work, the shower floor was tiled over the drain. Friedman thereafter demanded that the floor tiles be ripped up and the work be performed again on account of the fact that a Village representative did not see the work being performed. The Michaels thereupon had the plumber tear open the tiled floor and perform the

39475.7

work again while Nellessen stood by for two hours and observed the operation. Friedman subsequently relented on his demand that the shower doors be removed.

57. The citation issued in connection with the handicap ramp was subsequently consolidated with the lawsuit concerning the shower in the garage.

*The Michaels' Request to the Village to Direct Future Communications to the Michaels' Attorney*

57. By letter dated June 27, 2008, George advised Irvin of Susan's progressive multiple sclerosis. Copies of that letter were transmitted to Letchinger and Friedman.

58. In the course of serving notices and letters upon Susan, Nellessen was able to observe Susan's physical condition and limited mobility.

59. Because of Susan's physical condition and limited mobility it was very difficult for her, using her walker, to come to the door. Each of Susan's encounters with Nellessen and his armed escort was very stressful for Susan, both physically and emotionally, and resulted in episodes of autonomic dysfunction.

60. In an effort to spare Susan further encounters of this sort, on October 7, 2008, the Michaels' attorney, Margaret Borcia, sent to the Village Prosecutor, William Y. Franks, by fax and U.S. mail a letter concerning the September 25, 2008 stop work order issued by the Village in connection with the handicapped ramp. In that letter Borcia requested as follows:

> Please direct any further communication regarding this matter to my office. There is no need to have the police bother Mrs. Michaels who has great difficulty answering the door.

61. In a letter to the Lake Bluff Police Department dated October 22, 2009, George advised the Village that:

> [Susan Michael is] confined to remain in the house as she suffers from an autonomic heart accompanied with primary progressive multiple sclerosis.

39475.7

> \* \* \*
>
> What you should know [is] that with an autonomic heart, stress such as armed officers alarming her, could literally drop her heart rate, which could result in a fatality.
>
> \* \* \*
>
> I would appreciate it if you would simply give me a call [he provided his cell phone number] so I may stop by your office voluntarily. . . .

*The Incident of January 12, 2010*

62. On January 12, 2010, Nellessen appeared at the Michaels' door to serve Susan with the Complaint for Zoning Ordinance Violations and Monetary Fines relating to the shower in the garage. As usual, he was accompanied by an armed police escort. The Michael's mentally-handicapped adult daughter, Dorothy, answered the door. Nellessen asked Dorothy if her mother was home. Frightened by the repeated visits of Nellessen and other Village officials with armed police escorts and knowing the emotional distress that such visits caused her mother and knowing the physical difficulty that her mother had in even getting to the door, Dorothy responded, "No." While this encounter was going on, Susan, with her walker, was attempting to make her way to the door from another room. When she made it to the entranceway, Nellessen greeted her with the comment: "Do you always tell your children to lie?" Flustered and panicked by the situation, Susan felt an autonomic crisis coming on. Nellessen then forced the papers on Susan, abruptly turned on his heels and departed. Unable to hold Nellessen's papers, close the door, and maneuver her walker at the same time, Susan landed on the floor, experiencing severe pain in her right hip. Susan's hip pain continued in the days following the fall, and hip replacement surgery was subsequently required.

63. Immediately following the incident with Nellessen, Susan also began to suffer an acute outbreak of brain lesions. Upon examination at the University of Chicago Medical Center

a few days after the fall, it was confirmed that myriads of brain lesions had spread over the surface of her brain. At the direction of her physician, Susan was thereupon immediately admitted to the hospital where she remained for three days and was treated for the acute outbreak of lesions. Prior to the January 12, 2010 confrontation, Susan's condition had been in remission and she had been off interferon injections for over a year.

64. From the University of Chicago Medical Center, Susan was transported to the Rehabilitation Institute of Chicago at Alexian Rehabilitation Hospital in Elk Grove Village, Illinois, where she remained for 17 days. Hip replacement surgery was determined to be necessary, but was delayed by Susan's doctors on account of their concern that the trauma of surgery would exacerbate the already enhanced lesions on her brain and spine. The hip replacement and pelvic reconstruction surgery took place on June 24, 2010, and was followed by several weeks of rehabilitation. Susan's doctors also determined that it was necessary to resume Susan's interferon treatment, but delayed doing so until November 2010 after the hip surgery had been completed and the brain lesions had reached a quiescent state.

65. The foregoing outbreak of brain lesions has compromised Susan's prospects for recovery.

66. Susan has not been able to walk since January 12, 2010.

## COUNT I

(1983 claim on behalf of George and Susan Michael
against Letchinger, Irvin, Nellessen, and Friedman)

67. The Michaels incorporate by reference paragraphs 1 through 66 above

68. On information and belief, subsequent to the Church's April 10, 2007 filing of an application for a non-homestead property tax exemption, Letchinger, Irvin, Nellessen, and Friedman (collectively, the "Village Officials") agreed upon a plan to utilize the Village's

building code and zoning regulations as a means of making a series of discriminatory, improper, unreasonable, excessive and selectively-enforced demands, requirements, impositions and prosecutions upon and against the Michaels.

69. These actions included the following:

    (a) Irvin's issuance on October 20, 2009 (less than three months after the Church filed an administrative review action concerning the property tax exemption) of a $577,500 notice of violation for a shower that the Village had known of since at least 2006 (and that Letchinger and Friedman had known of since at least 2007);

    (b) Friedman's filing of a Complaint concerning the shower (i) falsely alleging that the Michaels had constructed the shower, (ii) notwithstanding the April 2007 settlement concerning the garage, and (iii) notwithstanding the fact that the shower had been in existence for decades;

    (c) Nellessen's and Irvin's issuance of unreasonable, unfounded, and improper demands and orders concerning the deck and handicapped ramp; and

    (d) Friedman's filing of a $115,000 Complaint alleging that the Church constituted an impermissible use, notwithstanding the fact that the Village had, over a period of years, led the Michaels to believe that the Village would not require a special use permit.

70. On information and belief, the purpose of these actions was:

    (a) to collect building code and zoning fines as a means of recouping the legal expenses incurred by the Village in challenging the property tax exemption;

    (b) to systematically harass, punish and retaliate against the Michaels on account of the filing of the application for the property tax exemption;

    (c) to systematically harass the Michaels as a means of driving them from the Village on account of their religion and/or ethnicity;

    (d) to systematically harass the Michaels as a means of driving them from the Village on account of the Village Officials' personal animus toward the Michaels; and/or

    (e) to prevent the Michaels from practicing their faith.

71. The conduct of the Village Officials described above was committed while they were acting under color of state law.

72. The actions of the Village Officials described above were undertaken for reasons wholly unrelated to any legitimate state or municipal objective.

73. On information and belief, the Village Officials, through their improper, unreasonable, excessive and selectively-enforced demands, requirements, impositions and prosecutions, have treated the Michaels differently from other Village residents who are subject to the Village's building code and zoning regulations. On information and belief, no other Village residents have been subjected to similar treatment. This difference in treatment is without any rational basis or, on information and belief, is the result of personal animus against the Michaels or anti-Armenian animus, or anti-Armenian Orthodox animus.

74. The foregoing conduct deprived the Michaels of: equal protection of laws in violation of the Fourteenth Amendment of the United States Constitution, the right to substantive due process in violation of the Fourteenth Amendment of the United States Constitution; and their rights under the Free Exercise Clause of the First Amendment of the United States Constitution.

75. The Village Officials' foregoing conduct was the direct, proximate, and foreseeable cause of the injuries and consequential damages to the Michaels.

76. The aforementioned acts were in violation of 42 U.S.C. § 1983.

77. The deprivation of plaintiffs' rights by the Village Officials was willful, knowing, and capricious. An award of punitive damages is warranted against these defendants.

WHEREFORE, plaintiff George Michael and plaintiff Susan Michael each pray for judgment in their favor and against defendants Christine Letchinger, R. Drew Irvin, Gerald

- 17 -

Nellessen, and Peter Friedman, jointly and severally, granting each of them following relief: (a) compensatory damages in an amount to be proved at trial; (b) punitive damages in an amount to be proved at trial; (c) the fees, costs and other expenses incurred in the prosecution of this action under 42 U.S.C. § 1988; and (d) such other and further relief as this Court deems just and proper.

          GEORGE S. MICHAEL and
          SUSAN MICHAEL

By:     */s/ David A. Eide*
        One of Their Attorneys

Lawrence M. Karlin (#3125137)
David A. Eide (#6199184)
KARLIN EIDE LLP
651 W. Washington St., Ste. 205
Chicago, IL 60661
312-845-2515

Dated: March 22, 2012

- 17 -

39475.7

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that, on March 22, 2012, the foregoing First Amended Complaint was filed through the Court's CM/ECF system and thereby served on all counsel of record.

                                                                          */s/ David A. Eide*